**CHIQUITA FRESH NORTH AMERICA, LLC, Dole Fresh Fruit Company, S. Katzman Produce Inc. and Katzman Berry Corp., Plaintiffs,**

v.

**FIERMAN PRODUCE EXCHANGE INC. and Morris Okun, Inc. Intervening Plaintiffs,**

v.

**Long Island Banana Corp., Suffolk Banana Co., Inc., Thomas J. Hoey, Yolanda Hoey, Brook Enterprises Ltd., H B Realty Corp. and Stuls Holdings Corp., Defendants.**

**14-cv-0982(ADS)(AKT)**

United States District Court, E.D. New York.

Signed July 28, 2016

McCarron & Diess, Attorneys for the Plaintiffs and Intervening Plaintiffs, 707 Walt Whitman Rd., 2nd Floor, Melville, NY 11747, By: Gregory A. Brown, Esq., Of Counsel

Herrick Feinstein LLP, Attorneys for the Defendants Long Island Banana Corp., Suffolk Banana Co., Inc., Brook Enterprises Ltd., H B Realty Corp., and Stuls Holdings Corp., 2 Park Avenue, New York, NY 10016, By: James Glucksman, Esq., Robert L. Rattet, Esq., Of Counsel

Goetz Fitzpatrick LLP, Bankruptcy Counsel for the Defendants Long Island Banana Corp. and Suffolk Banana Co., Inc., One Penn Plaza, 44th Floor, New York, NY 10119, By: Gary M. Kushner, Esq., Of Counsel

Thomas J. Hoey, Pro Se

Yolanda Hoey, Pro Se

## ORDER

SPATT, District Judge:

### I. BACKGROUND

On February 14, 2014, the Plaintiffs Chiquita Fresh North America, LLC; Dole

Fresh Fruit Company; S. Katzman Produce, Inc.; and Katzman Berry Corp. (collectively, the "Plaintiffs") commenced this action under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e(c)(5), against Long Island Banana Corp. ("LI Banana"), Suffolk Banana Co., Inc. ("Suffolk Banana"), and their common principal, namely, Thomas J. Hoey. ("Thomas Jr.").

In general, the complaint alleged that between December 3, 2013 and January 28, 2014, the Plaintiffs sold and delivered to the Defendants $718,515.85 worth of produce, for which the Defendants allegedly never paid. Under PACA, upon the Defendants' receipt of the produce, a statutory trust (the "PACA Trust") was created for the Plaintiffs' benefit, which was comprised of the goods themselves and any related funds. Thus, the Plaintiffs allege in their complaint that they are beneficiaries of the PACA Trust, and as such, are entitled to recover the amounts due, plus interest, attorneys' fees, and costs.

On the same date this action was commenced, the Plaintiffs also brought a motion by Order to Show Cause, pursuant to Fed. R. Civ. P. 55 and 65, seeking to preliminarily enjoin and temporarily restrain the Defendants from transferring or otherwise dissipating their assets up to the sum of $718,515.85, except for the purpose of making the payment owed to the Plaintiffs. The Court signed the Order to Show Cause and temporary restraining order, and made the motion returnable on March 13, 2014.

However, prior to the motion hearing, the parties informed the Court that they had agreed to the terms of a consent injunction and a procedure by which all creditors of the alleged PACA Trust could make claims and be heard in this action. In particular, the parties stipulated that the Defendants would actively preserve all trust assets and create a dedicated escrow account for this purpose. The parties also stipulated that potential creditors could seek to intervene and file a proof of claim to such assets on or before April 18, 2014.

On March 8, 2014, the Court entered an order effectuating the parties' agreement.

On March 26, 2014, counsel for the Plaintiffs advised the Court that the Defendants were apparently attempting to negotiate the sale of certain real property located at 596 Merrick Road in Lynbrook ("596 Merrick Road"), which property the Plaintiffs believed to be controlled, although perhaps not owed by LI Banana, and therefore, an asset of the PACA Trust. Accordingly, the Plaintiffs sought an order directing the Defendants to deposit any proceeds from the sale of 596 Merrick Road into the dedicated escrow account for the benefit of the PACA creditors.

On March 28, 2014, the Defendants filed a letter opposing the relief sought by the Plaintiffs and disputing their claim that 596 Merrick Road constituted a PACA Trust asset. In particular, the Defendants asserted that 596 Merrick Road was purchased in 1985 with funds wholly unrelated to the Plaintiffs or the subject of this dispute; that 596 Merrick Road had not been used in connection with the Defendants' business for approximately 25 years; and that 596 Merrick Road was, in actuality, vacant. The Defendants conceded that 596 Merrick Road was in contract to be sold, such contract having been scheduled to close one day earlier, namely, March 27, 2014.

In support of their opposition, the Defendants submitted an affidavit from Yolanda Hoey ("Yolanda"), who is the sister of Thomas Jr. and the acting President and Owner of LI Banana and Suffolk Banana. In her affidavit, Yolanda stated that in approximately 1990 or 1991, LI Banana moved its operations away from 596 Merrick Road to a facility located at 28

Williams Street in Lynbrook ("28 Williams Street"). She stated that 596 Merrick Road has not been used in LI Banana's business since that time, and has instead been rented to independent tenants unrelated to the Defendants or their business interests. She further stated that 596 Merrick Road is not actually owned by LI Banana, but by a separate entity called Brooke Enterprises. However, Thomas Jr. also controls and is the sole shareholder of Brooke Enterprises.

On March 28, 2014, 28 William Street Corp., the corporate landlord of the 28 Williams Street property (the "Landlord"), also filed a letter in this case. In relevant part, the letter stated that, at the time that this Court imposed the injunctive relief described above, the Landlord had been in the process of evicting LI Banana from 28 Williams Street based on its failure to pay rent. Apparently, after this Court granted the injunctive relief, the Defendants also sought a temporarily restraining order from a state housing court to halt the Landlord's eviction efforts.

Further, the Landlord advised the Court that Thomas Jr. was, at that time, incarcerated in the Metropolitan Correction Center on unrelated criminal charges, and was allegedly attempting to liquidate the assets of LI Banana and Suffolk Banana. In particular, in addition to the scheduled closing on 596 Merrick Road, the Landlord also allegedly learned of a possible sale by the Defendants of a separate property located at 534 Merrick Road ("534 Merrick Road"). In this regard, the Landlord attached a copy of a Power of Attorney that Thomas Jr. executed in favor of non-party Alison Bretherick for the sole purpose of negotiating a sale of 534 Merrick Road.

In view of these facts, the Landlord requested that it be permitted to intervene; that the consent injunction entered into by the parties be expanded to include all creditors of the Defendants, rather than simply PACA Trust creditors; and that the Court appoint a receiver to properly liquidate the assets of LI Banana and Suffolk Banana for the benefit of the creditors.

Apparently, on April 1, 2014, Brooke Enterprises closed on the sale of 596 Merrick Road.

By letter dated April 3, 2014, the Defendants opposed the appointment of a receiver, contending that the Landlord, who is not a PACA Trust creditor, and whose only claim against the Defendants arises from a landlord-tenant dispute being litigated in state court, lacks standing to intervene in this action.

Also, apparently, on April 3, 2014, LI Banana and Suffolk Banana filed separate petitions for Chapter 11 bankruptcy relief in the Eastern District of New York, which placed in effect an automatic stay of the proceedings as against them. The Chapter 11 proceeding was eventually converted to a Chapter 7 proceeding.

On April 4, 2014, the Plaintiffs filed an amended complaint, which is now the operative pleading in this action. The amended complaint added the following Defendants: (i) the acting principal of LI Banana and Suffolk Banana, namely, Yolanda; (ii) the corporate owner of 596 Merrick Road, namely, Brooke Enterprises; (iii) the corporate owner of 534 Merrick Road, namely, H B Realty Corp., ("HB Realty"); and (iv) Stuls Holding Corp. ("Stuls"), an alleged alter ego of LI Banana and Suffolk Banana also controlled by Thomas Jr. In particular, the amended complaint alleged that these Defendants improperly received proceeds from sales by LI Banana and Suffolk Banana of quantities of produce, in violation of PACA's trust provisions, and that they continue to wrongfully hold these assets.

The amended complaint also identified Fierman Produce Exchange, Inc. and Mor-

ris Okun, Inc. as Intervening Plaintiffs (collectively with the original Plaintiffs, the "Plaintiffs"), alleging that they, along with the original Plaintiffs, sold and delivered produce to the Defendants for which they were never paid. The total loss amount alleged in the amended complaint was increased from $718,515.85 to $737,272.76.

On April 4, 2014 and April 7, 2014, the Court held hearings at which counsel for several of the parties made oral arguments. In a written decision dated April 7, 2014, the Court granted the Plaintiffs' request for an evidentiary hearing regarding the location of the proceeds of the sale of 596 Merrick Road, and whether that property constituted a PACA Trust asset subject to the parties' consent injunction. However, due to calendar conflicts, the Court referred this matter to United States Magistrate Judge A. Kathleen Tomlinson to conduct the necessary hearing and prepare a report and recommendation on the outstanding issues.

On May 13, 2014, the parties filed a stipulation regarding LI Banana and Suffolk Banana's Chapter 7 cases. In particular, the parties agreed that: (i) pursuant to orders of the bankruptcy court, (a) LI Banana and Suffolk Banana had abandoned their interests in the dedicated PACA escrow account, which then held $476,033.97, and (b) the automatic stay under the bankruptcy code was lifted as to those funds; and (ii) a settlement had been reached among the bankruptcy trustee, certain of the PACA Trust creditors, and other non-PACA creditors of LI Banana and Suffolk Banana regarding the distribution of approximately $678,500. The bankruptcy court approved this arrangement, and this Court So-Ordered the stipulation.

On referral from this Court, on June 23, 2014 and July 17, 2014, Judge Tomlinson held an evidentiary hearing, at which multiple witnesses gave testimony. By Civil Conference Minute Order dated July 17, 2014, the court reserved decision, and ordered that the assets of the Defendant entities were to be generally preserved in the interim.

## II. THE REPORT AND RECOMMENDATION

On July 7, 2016, Judge Tomlinson issued a 57-page Report and Recommendation (the "R&R"), which, pursuant to Fed. R. Civ. P. 52(a), contained the court's findings of fact and conclusions of law after the two-day evidentiary hearing. While the Court will not repeat Judge Tomlinson's report in full, the following recommendations are relevant for present purposes.

Applying the test laid out in by the Second Circuit in *In re Kornblum & Co, Inc.*, 81 F.3d 280, 284 (2d Cir.1996), Judge Tomlinson observed that, in order to establish that 596 Merrick Road is *not* an asset of the PACA Trust in this case, the burden rested with the Defendants to demonstrate that one of the following circumstances was true:

> That (1) no PACA trust existed when [596 Merrick Road was] purchased; or that (2) even though a PACA trust existed at that time, [the property was] not purchased with trust assets; or that (3) although a PACA trust existed when [the property was] purchased and [the property was] purchased with trust assets[,] the debtor thereafter paid all unpaid sellers in full prior to the transactions involving the [PACA] Creditors, thereby terminating the trust.

*Kornblum*, 81 F.3d at 287.

As to the first factor, the court found that the Defendants failed to present any evidence establishing when the PACA Trust was created relative to Brooke Enterprises' purchase of 596 Merrick Road. Nor did the Defendants address that question in their proposed findings of fact and conclusions of law. Therefore, Judge Tomlinson opined that the Defendants had not sustained their burden under the first step of the *Kornblum* test of proving that no

PACA Trust existed at the time the subject property was acquired.

As to the second factor, the court referred to the testimony of Thomas Hoey, Sr. ("Thomas Sr.")—the father of Thomas Jr. and the former principal of both Brooke Enterprises and LI Banana—that he was one of a group of business partners who purchased 596 Merrick Road in 1986 for $993,440; that the group made a down payment of $300,000 at the closing; and that the partners used their personal funds—Thomas Sr.'s "savings"—and not money derived from the business operations of LI Banana or Suffolk Banana, to make the down payment. Judge Tomlinson found this testimony to be credible and concluded that the initial $300,000 Brooke Enterprises, acting through Thomas Sr. and his cohorts, paid to acquire 596 Merrick Road did not derive from PACA funds.

Nevertheless, Brooke Enterprises gave a mortgage on 596 Merrick Road for the approximately $693,440 balance remaining on the purchase price, which mortgage was satisfied on October 10, 1995. Judge Tomlinson found that unrebutted evidence presented at the hearing had established that the mortgage had been paid off using the proceeds of the sale of bananas by LI Banana and/or Suffolk Bannana—so-called "banana money." Therefore, Judge Tomlinson concluded that Brooke Enterprises had used PACA funds to acquire 596 Merrick Road, and consequently, the property is appropriately considered an asset of the PACA Trust. As a result, the Defendants had also failed to sustain their burden under the second step of the *Kornblum* test.

Finally, the court found that, although the evidence demonstrated a general pattern on the part of the Defendants to pay their suppliers' invoices as they came due in the ordinary course of business, the record did not support a finding that LI Banana and Suffolk Banana attempted to pay all of their outstanding suppliers in full so as to terminate the PACA trust. Therefore, the Defendants failed to sustain their burden under the third step of the *Kornblum* test.

Based on these findings, Judge Tomlinson concluded that 596 Merrick Road was a PACA asset subject to the parties' consent injunction in this case. Thus, inasmuch as the PACA creditors are entitled to have the proceeds of the April 1, 2014 sale of the property preserved for their benefit, the court inquired into the present whereabouts of those funds.

Initially, the Court notes that 596 Merrick Road was sold for $700,075. Based on the evidence at the hearing, Judge Tomlinson determined that the funds were distributed as follows:

| Individual/Entity | Amount |
|---|---|
| Becker Realty | $28,000 |
| Lawrence Omansky | $37,000 |
| Advantage Title Company | $176,937 |
| Brooke Enterprises. Ltd. | Approximately $10,000-$12,000 |
| Alison Bretherick | Approximately $47,727 |
| Driscoll & Redlich | $40,000 |
| Fischetti & Malgieri | $50,800 |
| Goetz Fitzpatrick | $40,000 |
| Law Office of Eric Franz | $205,000 |
| Karp Auto | $740.94 |
| Herrick Feinstein | $55,000 |
| Yolanda Hoey | $2,000 |
| T&M Protection Services | $18,000 |
| Marie Hoey | $5,000 |
| Brian Kupchik | $5,000 |
| Ellen Bruno | $1,018.50 |
| Total Amount: | Approximately $722,224.07 to $724,224.07 |

The Court notes that the R&R more fully describes the basis for certain of these figures being approximations, and the Court need not repeat those descriptions here. However, the Court will also note that Judge Tomlinson specifically addressed the fact that the sum of these distributions exceeds the total purchase price of $700,075. In this regard, she explained that:

This is not surprising considering Bretherick's testimony that she made other "limited" deposits in the Accounts in addition to the Sale Proceeds. It therefore appears that trust assets (*i.e.*, the Sale Proceeds) and non-trust assets may have been commingled in the Accounts. Since Bretherick opened the Accounts for the express purpose of depositing the Sale Proceeds, the Court finds that the Non-Debtor Defendants bear the burden of proving that any monies deposited into the Accounts were not traceable to the sale of produce and should not be treated as trust assets. ... The Non-Debtor Defendants did not attempt to make such a showing here. The Court therefore concludes that all funds which were (1) distributed at the April 1, 2014 closing and (2) distributed

from and remain in the Accounts, are proceeds from the sale of [596 Merrick Road].

R&R at 52-53.

Based on these findings, Judge Tomlinson concluded that, because 596 Merrick Road is a PACA Trust asset, the Plaintiffs are legally entitled to "reach the proceeds" from the sale of that property, and therefore, those holding the subject funds should be required to disgorge them. However, recognizing that these proceeds have apparently been widely distributed to various individuals and entities, Judge Tomlinson noted that, generally, third parties who receive PACA trust property are not liable to the trust beneficiaries, *i.e.*, the Plaintiffs, "unless the PACA trustee's act in giving the property was a breach of trust, and unless the third party had notice of the breach." *See* R&R at 53 (quoting *E. Potato Dealers, Inc. v. TNC Packing Corp.*, No. 08–cv–6280, 2011 WL 2669632, at *12, 2011 U.S. Dist. LEXIS 73025, at *38 (W.D.N.Y. July 6, 2011)).

Applying this standard, the court found that the hearing record supported a finding that the Defendants breached the PACA Trust by permitting Brooke Enter-

prises to use proceeds from the sale of produce to pay off the mortgage on 596 Merrick Road. Thus, if the recipients of the sale proceeds cannot establish that they lacked notice of the breach or that they were otherwise *bona fide* purchases for value, then they may be compelled to disgorge the distributions.

Ultimately, Judge Tomlinson made the following recommendations to this Court:

(1) That Brooke Enterprises be compelled to disgorge the approximately $10,000 to $12,000 in sale proceeds in its possession in Hudson Valley Bank account number 2000728001, and that such funds be deposited in the PACA escrow account created in this action;

(2) That Yolanda Hoey be compelled to disgorge the $2,000 in sale proceeds distributed to her by way of check numbers 0096 and 109 drawn on Hudson Valley Bank account number 2000058806, and that such funds be deposited in the PACA escrow account created in this action; and

(3) Because the focus of the hearing was not on the potential liability of third-party transferees, at this juncture, the record is insufficient to determine whether the remaining distributees of the sale proceeds outlined in the chart above may be compelled to disgorge the PACA Trust assets in their possession. However, it was recommended that this Court permit the Plaintiffs to seek such relief by way of motion on notice at a later date.

### III. CONCLUSION

On July 7, 2016, the R&R was served on counsel for the parties via ECF.

More than fourteen days have elapsed since such service, and no objections have been filed.

Therefore, pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72, this Court has reviewed the R&R for clear error, and finding none, now concurs in both its reasoning and its result.

Accordingly, the July 7, 2016 Report and Recommendation is adopted in its entirety, and the Plaintiffs' motion is granted as set forth herein. Within 20 days of the date of this Order, the Court directs the Plaintiffs to file a written status report on ECF outlining what actions, if any, remain to be taken in this case. Any party wishing to respond may do so in writing on ECF within 7 days after such filing by the Plaintiffs.

Finally, the Court extends its gratitude to Judge Tomlinson for all of her outstanding assistance in this matter.

It is **SO ORDERED**

### REPORT AND RECOMMENDATION

A. KATHLEEN TOMLINSON, Magistrate Judge:

### I. PRELIMINARY STATEMENT

Plaintiffs Chiquita Fresh North America, LLC, Dole Fresh Fruit Company, S. Katzman Produce Inc., and Katzman Berry Corp. (collectively, the "Original Plaintiffs"), and intervenor plaintiffs Fierman Produce Exchange Inc. and Morris Okun, Inc. (collectively, the "Intervenor Plaintiffs") (together with the Original Plaintiffs, the "Plaintiffs") bring this action against Long Island Banana Corp. ("LIB") and Suffolk Banana Co. ("Suffolk Banana") (collectively, where appropriate, the "Debtor Defendants"), as well as Thomas J. Hoey ("Thomas Hoey, Jr."), Yolanda Hoey, Brook Enterprises, Ltd. ("Brook"), H B Realty Corp. ("HB Realty"), and Stuls Holding Corp. ("Stuls") (collectively, the "Non-Debtor Defendants"), to enforce the trust provisions of Section 5(c) of the

Perishable Agricultural Commodities Act, 7 U.S.C. § 499e(c) ("PACA").

Presently before the Court is the motion filed by the Original Plaintiffs, joined in by the Intervenor Plaintiffs, seeking an Order directing that the proceeds from the sale of real property located at 596 Merrick Road in Lynbrook, New York (the "596 Property") be deposited into the escrow account established pursuant to the consent preliminary injunction entered in this case (the "Consent Injunction"). DE 32. Judge Spatt referred Plaintiffs' motion to this Court to hold an evidentiary hearing and to issue a Report and Recommendation addressing "(1) the issue of whether the 596 Property is a PACA asset subject to the Consent Injunction; (2) the issue of the present location of the proceeds from the sale of the 596 Property; and (3) any other issues which may be relevant." Apr. 7, 2014 Order [DE 55]. In his Referral Order, Judge Spatt acknowledged that an automatic stay pursuant to 11 U.S.C. § 362(a) was in effect with respect to LIB and Suffolk Banana, which filed for bankruptcy in the Eastern District of New York. Apr. 7, 2014 Order at 5.

This Court conducted an evidentiary hearing during which the Non-Debtor Defendants and Plaintiffs presented evidence. See DE 117, DE 121. In accordance with Rule 52(a) of the Federal Rules of Civil Procedure, the Court now issues its findings of fact and conclusions of law. After carefully considering the evidence introduced at the hearing, the arguments of counsel, and the controlling law on the issues presented, the Court concludes that (1) the 596 Property is a PACA asset subject to the Consent Injunction, and (2) the proceeds from the sale of the 596 Property have been distributed to defendants Brook and Yolanda Hoey, as well third-party entities and individuals set forth in more detail in this Report and Recommendation. The Court recommends to Judge Spatt that (1) defendants Brook and Yolanda Hoey be compelled to disgorge the proceeds they received from the sale of the 596 Property, and (2) to the extent Plaintiffs seek to compel third parties to disgorge the sale proceeds distributed to them, that Plaintiffs be permitted to make a motion seeking this relief.

## II. RELEVANT BACKGROUND

The Original Plaintiffs commenced this action on February 14, 2014 against the LIB, Suffolk Banana, and Thomas Hoey, Jr. (collectively, the "Original Defendants") to enforce the trust provisions of Section 5(c) of PACA. See Compl. [DE 1]. The Complaint alleges that between December 3, 2013 and January 28, 2014, Plaintiffs sold and delivered to the Original Defendants in interstate commerce wholesale quantities of produce worth $719,515.85 and that the Original Defendants failed to pay for the goods when payment was due. Id. ¶¶ 7-8.

The same day this action was filed, Judge Spatt entered a temporary restraining order prohibiting the dissipation or alienation of any assets of LIB and Suffolk Banana pending a hearing on the Original Plaintiffs' motion for a preliminary injunction. See DE 15. On March 7, 2014, the parties agreed to the Consent Injunction which, inter alia, established an escrow account ("the PACA Escrow"), placed various restrictions on the assets and properties of LIB and Suffolk Banana, and set forth a procedure to assert PACA claims. Judge Spatt approved the Consent Injunction on March 8, 2014. See DE 23.

On March 26, 2014, the Original Plaintiffs filed the instant letter motion regarding the 596 Property. See DE 32. Specifically, the Original Plaintiffs contended that the Original Defendants were improperly negotiating the sale of the 596 Property which, according to the Original Plaintiffs,

is a PACA trust asset "even if it is not owned by LIB or Suffolk Banana." *Id.* The Original Plaintiffs requested that Judge Spatt (1) direct counsel for the Original Defendants to deposit the proceeds from the sale of the 596 Property into the PACA Escrow established pursuant to the Consent Injunction, and (2) schedule a hearing "to determine whether the Consent Injunction should be modified to vest the PACA Creditors with control over the sale of defendants' assets." *Id.* at 2.

The Original Defendants opposed the relief sought by the Original Plaintiffs. *See* DE 34. The Original Defendants contended that the acquisition of the 596 Property was never funded with any PACA proceeds or with any proceeds that could possibly be connected to the Original Plaintiffs. *See id.* Therefore, the Original Defendants asserted that neither the 596 Property nor the proceeds from its sale constitute PACA assets. *See id.* The Original Defendants further noted that "ownership of the 596 Property has been in the name of Brooke Enterprises, a separate entity now owned by Thomas Hoey, Jr." *Id.*

Judge Spatt conducted a hearing on April 4, 2014, during which the parties and certain non-parties presented their arguments regarding the relief requested in the Original Plaintiffs' motion. *See* Apr. 4, 2015 Civil Cause for Hearing [DE 58]; *see also* Apr. 7, 2014 Order at 4. The parties also informed Judge Spatt that, on April 3, 2014, LIB and Suffolk Banana had filed separate bankruptcy petitions in the Eastern District of New York seeking relief from their creditors pursuant to Chapter 11 of the Bankruptcy Code. *See* Apr. 7,

2014 Order at 4. Judge Spatt set this matter down for a continued hearing as to whether the proceeds of the sale of the 596 Property constituted a PACA asset, and further directed the attorney for the party in control of those proceeds, Lawrence Omansky, Esq. ("Attorney Omansky"), to appear at the continued hearing. *See id.* at 4–5.

Also on April 4, 2014, Plaintiffs filed an Amended Complaint, adding Yolanda Hoey, Brook, HB Realty, and Stuls as defendants. *See generally* Am. Compl. [DE 46]. The Amended Complaint alleges that, between November 27, 2013 and January 28, 2014, Plaintiffs sold and delivered to Defendants in interstate commerce wholesale quantities of produce worth $737,272.76 and that Defendants failed to pay for the goods when payment was due. *Id.* ¶¶ 6-7. The Amended Complaint further asserts the following causes of action against the various Defendants: (1) failure to pay trust funds against all Defendants; (2) failure to pay for goods sold against LIB and Suffolk Banana; (3) unlawful dissipation of trust assets by a corporate officer against Thomas Hoey, Jr.; (4) unlawful dissipation of trust assets by a corporate officer against Yolanda Hoey; (5) failure to make prompt payment of trust funds against Thomas Hoey, Jr., Yolanda Hoey, LIB, and Suffolk Banana; (6) breach of contract against LIB and Suffolk Banana; (7) unlawful retention of trust assets against Thomas Hoey, Jr., Yolanda Hoey, Brook, HB Realty and Stuls; (8) alter ego liability against LIB, Suffolk Banana, Brook, HB Realty, and Stuls; and (9) interest and attorneys' fees against all Defendants. *See id.* ¶¶ 11-61.[1]

---

1. On May 4, 2014, Brook, HB Realty, and Stuls moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint as against them for failure to state a claim upon which relief can be granted. *See* DE 82. The Plaintiffs opposed the motion. *See* DE 97. Judge Spatt denied the motion on June 23, 2014. *See Chiquita Fresh N. Am., LLC v. Long Island Banana Corp.,* 27 F.Supp.3d 340, 344 (E.D.N.Y.2014) [DE 116]. The Non-Debtor Defendants filed their Answer to the Amended Complaint on July 22, 2014. *See* DE 122.

On April 7, 2014, Judge Spatt continued the hearing originally commenced on April 4, 2014. *See* Apr. 7, 2014 Order at 5; Apr. 7, 2015 Civil Cause for Hearing [DE 59]. During the hearing, Judge Spatt learned that on April 1, 2014, Brook closed on the sale of the 596 Property and distributed the proceeds from the sale. *See* Tr. of Apr. 7, 2014 Hrg., at 46-47. Judge Spatt acknowledged that an automatic stay pursuant to 11 U.S.C. § 362(a) was in effect with respect to LIB and Suffolk Banana since they had filed for Chapter 11 bankruptcy. Apr. 7, 2014 Order at 5. However, Judge Spatt granted the Plaintiffs' request for an evidentiary hearing as to (1) the present location of the proceeds from the sale of the 596 Property and (2) whether the 596 Property is a PACA asset subject to the Consent Injunction. *Id.*

Following the April 7, 2014 hearing, Judge Spatt issued an Order referring the matter to this Court to hold an evidentiary hearing and issue a Report and Recommendation addressing "(1) the issue of whether the 596 Property is a PACA asset subject to the Consent Injunction; (2) the issue of the present location of the proceeds from the sale of the 596 Property; and (3) any other issues which may be relevant." *Id.* at 6. Judge Spatt further directed Plaintiffs "to immediately file a letter to the attention of this Court detailing their specific discovery requests, which will be subject to Court approval." *Id.*

Plaintiffs thereafter submitted a letter to Judge Spatt requesting certain discovery in advance of the evidentiary hearing before this Court. *See* DE 54. Defendants opposed the Plaintiffs' discovery requests and submitted their own requests for documents or information. *See* DE 60. Judge Spatt granted Plaintiffs' requests to the extent of directing Defendants to provide Plaintiffs with the following:

(1) any and all documents or things in the possession, custody or control of de-fendants, their agents and attorneys related to the sale of the Premises by Brook Enterprises, Ltd., including but not limited to written agreements, closing statements, checks, corporate resolutions and powers of attorney; (2) any and all documents or things in the possession, custody or control of defendants, their agents and attorneys related to the acquisition by Thomas J. Hoey, Jr. of the stock or other ownership interests in Brook Enterprises, Ltd., including but not limited to written agreements, closing statements, checks, corporate resolutions and stock certificates; (3) any and all documents or things defendants plan to offer for identification or evidence at the hearing scheduled for May 14, 2014; and (4) the oral examination under oath of Thomas J. Hoey, Jr. pursuant to Fed. R. Civ. P. 30. The Court denies the Plaintiffs' request for production of any and all documents or things in the possession, custody or control of defendants, their agents and attorneys related to the purchase by Brook Enterprises, Ltd. of the property located at 596 Merrick Road, Lynbrook, New York including but not limited to written agreements, closing statements, checks, corporate resolutions and powers of attorney[.]

Apr. 14, 2014 Order [DE 66] at 4. Judge Spatt also partially granted the Defendants' requests by ordering the Plaintiffs to provide the Defendants with "(1) all current, valid PACA licenses for each of the Plaintiffs and (2) all documents or things the Plaintiffs intend to offer for identification or evidence at the hearing." *Id.* Judge Spatt noted that "[w]hether and to what extent these items are admissible at the evidentiary hearing will be subject to the supervision of Judge Tomlinson." *Id.* Judge Spatt clarified, in a subsequent Order, that in light of the automatic stay in effect against LIB and Suffolk Banana, these Defendants were not obligated to

comply with the April 14, 2014 discovery order. *See* DE 70.

This Court conducted the evidentiary hearing on June 23, 2014 and July 17, 2014. *See* DE 117, DE 121. The Court heard testimony from the following witnesses: (1) Dennis Ench, a certified public accountant with Caparo, Centofranchi, Tidona & Ench Co. ("the Caparo Firm") who has handled the accounts for Brook and Suffolk Banana since 1996, *see* Ench Test., 6/23/14 Tr., at 19-41, 100-113; (2) Thomas Hoey, Sr., father of Thomas Hoey, Jr. and a former principal of LIB and Brook, *see* Hoey Sr. Test., 6/23/14 Tr., at 43-56; (3) Alan Centofranchi, a certified public accountant with the Caparo Firm who has handled the account for LIB since 1996, *see* Centofranchi Test., 6/23/14 Tr., at 57-92; (4) Denise Forte, an attorney who represented Thomas Hoey, Jr. in a 2003 transaction regarding the ownership of LIB, Suffolk Banana, and Brook, *see* Forte Test., 6/23/14 Tr., at 113-140; (5) Alison Bretherick, an individual authorized by Thomas Hoey, Jr. to sign on his behalf at the closing of the 596 Property and to distribute certain proceeds from that sale, *see* Bretherick Test., 7/17/14 Tr., at 6-49; and (6) John Balducci, Sr., a former principal of LIB and Brook, *see* Balducci Test., 7/17/14 Tr., at 50-73.

Upon the conclusion of the evidentiary hearing, the Court reserved decision. *See* DE 121.[2] Plaintiffs and the Non-Debtor Defendants thereafter submitted their respective Proposed Findings of Fact and Conclusions of Law. *See* Non-Debtor Defs.' Proposed Findings of Fact and Conclusions of Law ("PFF&CL") [DE 123]; Pls.' PFF&CL [DE 124].

On May 13, 2015, the parties filed a Stipulation regarding the status of the Debtor Defendants' bankruptcy proceedings[3] and the distribution of the PACA Escrow. *See* DE 144. The Stipulation states, among other things, that on March 12, 2015, the bankruptcy court determined that the Debtor Defendants' interest in the PACA Escrow, which contains $476,033.97, "is deemed abandoned and the automatic stay provisions of 11 U.S.C. § 362 are no longer applicable to the PACA Escrow." *Id.* at 3. The Stipulation further states that the bankruptcy trustee, certain PACA trust creditors, and other creditors of the Debtor Defendants have entered into a settlement agreement (the "Bankruptcy Settlement") which contemplates that the distribution of settlement funds in the aggregate sum of $678,500.00 will be made to "all valid PACA trust creditors of LIB and Suffolk Banana." *Id.* at 3–4. In light of these developments, the parties agreed to distribute the funds from the PACA Escrow and the Bankruptcy Settlement to Plaintiffs and other PACA creditors in the manner and proportions set forth in the Stipulation. *See id.* at 6. Following a letter from Plaintiffs stating that the Bankruptcy Settlement had been approved by the bankruptcy court, *see* DE 145, Judge Spatt "so ordered" the Stipulation on May 14, 2015. *See* DE 146.[4]

---

**2.** The Court further directed "non-party Alison Bretherick not to dissipate any assets of the defendant entities and to refrain from making expenditures except for those made in the ordinary course of business to pay usual and customary business expenses as they come due." DE 121. The Court later clarified that this directive to Bretherick "is limited to the property located at 596 Merrick Road, Lynbrook, New York." Aug. 14, 2014 Elec. Order.

**3.** The Stipulation states that, on October 16, 2014, the bankruptcy court converted the Debtor Defendants' Chapter 11 bankruptcy proceedings to Chapter 7 and appointed a Chapter 7 bankruptcy trustee. *See* DE 146 at 3.

**4.** This Court thereafter directed the parties to file a joint letter setting forth what impact, if any, the Stipulation had on the instant dispute concerning the 596 Property. *See* 5/18/15 Elec. Order. The parties informed the Court

### III. FINDINGS OF FACT

The following section constitutes the Court's Findings of Fact pursuant to Federal Rule of Civil Procedure 52(a)(1). These Findings are drawn primarily from the testimony elicited during the two-day evidentiary hearing, the parties' exhibits and the pleadings, as well as the parties' Proposed Findings of Fact where an issue of fact is undisputed.

### A. Brook

Brook is a real estate company started by Thomas Hoey, Sr., Thomas Fitzsimmons ("Fitzsimmons"), John Bower ("Bower"), and John Balducci (collectively, the "Business Partners") in April 1986. *See* Hoey Sr. Test., 6/23/14 Tr., at 48:11-12; Balducci Sr. Test, 7/17/14 Tr., at 52:3-8; Brook Certificate of Incorporation, Non-Debtor Defs.' Ex. E. According to Thomas Hoey, Sr., the Business Partners "just started" Brook in 1986 and did not "buy" the company from anyone. Hoey Sr. Test., 6/23/14 Tr., at 48:11-14. John Balducci described Brook as the "real estate arm" of LIB's business. Balducci Sr. Test, 7/17/14 Tr., at 52:3-8. Indeed, Brook was included as an "affiliate" of LIB on a combined balance sheet prepared for the 2012 tax year. *See* 2012 Combined Balance Sheet, Pls.' Ex. 6; Ench Test., 6/23/14 Tr., at 48:11-12; *see also* Centofranchi Test., 6/23/14 Tr., at 72:25-73:1.[5] However, Brook files its own tax returns, pays its own taxes and insurance, and maintains its own bank accounts. Ench Test., 6/23/14 Tr., at 22:24-23:2; 24:15-22; 25:6-7; Balducci Sr. Test, 7/17/14 Tr., at 71:17-22; *see* Brook's 2008 Federal Tax Return, Pls.' Ex. 4; Brook's 2009-2012 Federal Tax Returns,

Schedule K-1 Forms, Non-Debtor Defs.' Exs. H-K.

Brook is the former owner of the 596 Property, which was sold on April 1, 2014. *See* Ench Test., 6/23/14 Tr., at 23:21-22; Bretherick Test., 7/17/14 Tr., at 8:14-16; Apr. 1, 2014 Closing Statement, Pls.' Ex. 12. Brook remains the owner of real property located at 590 Merrick Road, Lynbrook, New York ("the 590 Property"). *See* Ench Test., 6/23/14 Tr., at 23:21-22. Brook's operations have consisted solely of renting out the 596 Property to LIB and renting out the 590 Property to independent parties. *Id.* at 24:5-9; 36:9-14. Brook is not engaged in the business of buying and selling agricultural commodities and does not maintain a PACA license. *Id.* at 23:15-20; Balducci Sr. Test, 7/17/14 Tr., at 71:12-16.

### B. LIB and Suffolk Banana

It is undisputed that LIB and Suffolk Banana are entities licensed under PACA. *See* Non-Debtor Defs.' PFF&CL ¶ 3; Pls.' PFF&CL ¶ 1. Brook purchased LIB and the 596 Property as part of the same transaction on June 10, 1986. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1; Hoey Sr. Test., 6/23/14 Tr., at 44:24-45:25; 51:20-25.

### C. Changes in Ownership of LIB, Suffolk Banana, and Brook

The ownership of LIB, Suffolk Banana, and Brook has changed at least twice since Ench and Centofranchi started working as the companies' accountants in 1996. At that time, LIB, Suffolk Banana, and Brook were owned 70% by the John Balducci, Sr. and James Balducci, and 30% by Thomas Hoey, Sr. and Thomas Hoey, Jr. (collectively, "the Hoeys"). Ench Test., 6/23/14 Tr., at 23:9-10.[6]

---

that the Stipulation has no impact on their dispute. *See* DE 147.

**5.** Ench testified that Brook was included in the combined financial statement because it

was "renting property to Long Island Banana." Ench Test., 6/23/14 Tr., at 102:7-10.

**6.** John Balducci confirmed that Fitzsimmons and Bower no longer hold an interest in LIB,

### 1. 1999 Ownership Transaction

In July 1999, John Balducci ceased his affiliation with LIB, Suffolk Banana, and Brook (the "1999 Ownership Transaction"). *See* Balducci Sr. Test., 7/17/14 Tr., at 51:20-25, 52:11-15; John Balducci Resignation Ltrs., Non-Debtor Defs' Exs. B & C. As a result, James Balducci and the Hoeys each owned 50% of those companies. Ench Test., 6/23/14 Tr., at 31:7-17; Balducci Sr. Test., 7/17/14 Tr., at 52:3-7; July 14, 1999 Ltr re: Sale of Shares in LIB by John Balducci, Sr., Non-Debtor Defs.' Ex. D.

John Balducci testified that he is familiar with PACA from having worked for PACA-licensed businesses for many years. *See* Balducci Sr. Test., 7/17/14 Tr., at 57:8-58:6. Balducci also testified that he is "aware" of the trust imposed on the assets of PACA entities and the potential for personal liability under PACA. *See id.* at 58:1-9. When asked whether, to his knowledge, all PACA creditors had been paid in full at the time he separated from LIB and Brook in 1999, John Balducci stated that he "didn't think so because it is not the way business is conducted." *Id.* at 68:14-19; *see id.* 72:16-21. He further explained: "From what I understand, when you separate a business and you take whatever is in that separation, and the one retaining the business has to assume the responsibility of paying the bills, which are PACA's bills." *Id.* at 68:9-13.

Centofranchi corroborated this testimony, stating that there was no concerted effort by LIB or Suffolk Banana to pay all of their PACA produce suppliers in full on the date of the 1999 Ownership Transaction. *See* Centofranchi Test., 6/23/14 Tr., at 92:12-18. Rather, the PACA accounts payable of LIB and Suffolk Banana were paid

as the invoices came due and "[t]he business continued. They didn't stop business." *Id.* at 90:15-22, 93:4-7.

### 2. 2003 Ownership Transaction

In 2003, the ownership of LIB, Suffolk Banana, and Brook changed again when, as relevant here, James Balducci transferred his 50% interest in the companies to the Hoeys in exchange for the Hoeys' interest in another company, 28 Williams Street Corp. (the "2003 Ownership Transaction"). *See* Ench Test., 6/23/14 Tr., at 32:2-8; Balducci Sr. Test., 7/17/14 Tr., at 52:22-53:4; 2003 Ownership Transaction Docs., Non-Debtor Defs.' Exs. A1-A8. As a result of the 2003 Ownership Transaction, the Hoeys owned 100% of the stock in LIB, Suffolk Banana, and Brook, while James Balducci owned 100% of the stock in 28 Williams Street Corp. *See* 2003 Ownership Transaction Docs, Non-Debtor Defs.' Exs. A1-A8; Ench Test., 6/23/14 Tr., at 32:2-8; 33:1-3.

Attorney Denise Forte represented Thomas Hoey, Jr. at the closing of the 2003 Ownership Transaction. *See* Forte Test., 6/23/14 Tr., at 114:15-19, 116:19-25. During the hearing, Forte reviewed a bill of sale, indemnity agreement, and stock purchase agreement which were executed as part of the 2003 Ownership Transaction and which related to James Balducci's sale of his 50% interest in Brook. *See id.* at 125:6-127:14 (testifying as to Non-Debtor Defs.' Exs. A1-A3).[7] Forte testified that the bill of sale warrants that James Balducci sold his shares in Brook "free and clear." Forte Test., 6/23/14 Tr., at 125:9-16. The indemnity agreement states, in relevant part, that the seller "agrees to indemnify and hold Purchasers harmless from and against any and all losses, claims,

Suffolk Banana, or Brook. *See* Balducci Test., 6/23/14 Tr., at 60:6-19.

**7.** Although not reviewed by Forte during the hearing, the Non-Debtor Defendants' Exhibit

A also includes, as relevant here, indemnity agreements and stock purchase agreements related to James Balducci's sale of his 50% interest in LIB and Suffolk Banana. See Non-Debtor Defs.' Ex. A5-A8.

loans to the Corporation or on the books of the Corporation, obligations, liabilities, suits, actions, proceedings, judgments, fines, damages, penalties, costs, charges and expenses . . . ." Brook Indemnity Release and Agreement, Non-Debtor Defs.' Ex. A2. Forte testified that, in his opinion, the indemnity agreement "include[d] PACA claims." Forte Test., 6/23/14 Tr., at 126:5-6. Forte further stated that, to his knowledge, the indemnification clause in the stock purchase agreement—which contains language similar to the indemnity agreement—was intended to cover PACA liabilities, particularly since the parties did not include a provision specifically excluding them. *See id.* at 127:11-14. However, Forte admitted that he was not aware of any discussions among the parties to the 2003 Ownership Transaction regarding PACA claims or whether LIB and Suffolk Banana's produce suppliers had been paid in full as a consequence of that transaction. *See id.* at 128:6-25. Forte also testified that he did not know if any effort was made to pay off all of the produce suppliers, nor did he see any documents to that effect generated in connection with the closing of the 2003 Ownership Transaction. *See id.* at 129:10-17.

With regard to the 2003 Ownership Transaction, Centofranchi testified that LIB and Suffolk Banana continued "the normal course of operation" of paying their PACA creditors as their invoices came due and that "[n]othing changed" as a result of the change of ownership. Centofranchi Test., 6/23/14 Tr., at 90:23-91:2. In particular, Centofranchi confirmed that, for both the 1999 and 2003 Ownership Transactions, the PACA creditors "weren't paid in full. They remained as accounts payable." *Id.* at 91:5-8.

### 3. *Current Ownership*

It is undisputed that Thomas Hoey, Jr. is a principal and shareholder of LIB and Suffolk Banana. *See* Non-Debtor Defs.' Answer [DE 120][8] ¶ 4(c).[8] Thomas Hoey, Jr. is also Brook's primary shareholder and has been since at least 2008, according to Brook's federal tax returns. *See* Brook's 2008 Federal Tax Return, Schedule K-1 Form, Pls.' Ex. 4; Brook's 2009-2012 Federal Tax Returns, Schedule K-1 Forms, Non-Debtor Defs.' Exs. H-K.[9]

### D. Brook's Acquisition of the 596 Property

Brook purchased the 596 Property from Michael and Anthony Paolillo ("the Paolillo Brothers") on June 10, 1986. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1; Hoey Sr. Test., 6/23/14 Tr., at 44:24-45:25; 51:20-25. As part of this transaction with the Paolillo Brothers, Brook also purchased all outstanding stock in LIB and another company, Cargo Transfer, Inc. ("Cargo"). *See* Closing Statement, Pls.' Ex. 1. The total purchase price for this transaction was $993,400. *See id.* According to the June 10, 1986 Closing Statement, the purchase price was allocated as follows: (1) $200,000 for 330 shares of common stock in LIB; (2) $9,440 for 20 shares of common stock in Cargo; and (3) $782,000 for the 596 Property. *See id.*

At the June 10, 1986 closing, Brook paid $300,000 of the purchase price using (1) a $25,000 down payment, and (2) a certified check for $275,000. *See id.* According to Thomas Hoey, Sr., Brook did not use "banana money" to purchase LIB and the 596 Property because the Business Partners were not running a PACA business at the time of the acquisition. Hoey Sr. Test., 6/23/14 Tr., at 46:16-18; 55:9-19. Hoey Sr.

---

**8.** Thomas Hoey, Sr. testified that he "totally retired" from the companies in approximately 2008 or 2009. Hoey Sr. Test., 6/23/14 Tr., at 44:9-16.

**9.** Ench also testified that Thomas Hoey, Jr. has had "check writing authority" for Brook from 1996 onward. Ench Test., 6/23/14 Tr., at 36:19-21; 37:4-6.

testified that he contributed his own "savings" toward the purchase of LIB and the 596 Property. *See id.* at 46:9.

### E. Mortgage on the 596 Property

To cover the remaining $693,444 of the purchase price, Brook gave the Paolillo Brothers a mortgage on the 596 Property. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1; Balducci Sr. Test., 7/17/14 Tr., at 55:2-13. According to the June 10, 1986 Closing Statement, the mortgage commenced on July 10, 1986 at an interest rate of 10 ½ % and required Brook to make monthly payments of $8,333.34 for the first 60 months, followed by monthly payments of $11,083.34 for the last 60 months. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1. Brook satisfied the mortgage to the Paolillo Brothers on October 10, 1995. *See* Mortgage Satisfaction, Non-Debtor Defs.' Ex. G.[10]

John Balducci testified that he was involved in the acquisition of the 596 Property. *See* Balducci Sr. Test., 7/17/14 Tr., at 53:18-19. Balducci confirmed that a mortgage was issued in connection with Brook's purchase of the 596 Property, that the Paolillo Brothers were the holders of that mortgage, and that the mortgage was eventually paid off before he ceased his affiliation with LIB, Suffolk Banana, and Brook in 1999. *See id.* 55:2-19; 72:4-15. When asked whether he knew the source of the funds used to pay off the mortgage, Balducci testified that "[t]he funds were created by the sale of bananas." *Id.* at 55:20-25. In particular, Balducci testified as follows:

Q: Is it fair to say the sale from the produce of Long Island Banana was used to pay off the Paolillo mortgage?

A: Yes.

Q: And that would be true with regard to whether the mortgage was in the amount of $693,440 or $300,000; is that correct?

A: Yes.

*Id.* at 56:1-7.

### F. LIB's Rental Payments to Brook for the 596 Property

While Brook owned the 596 Property, LIB was the sole tenant and the only entity to pay rent to Brook for use of the premises. Ench Test., 6/23/14 Tr., at 36:9-14; 111:11-14; *see* Balducci Sr. Test., 7/17/14 Tr., at 71:8-11. From 1986 to approximately 1991, LIB operated out of the 596 Property. Hoey Sr. Test., 6/23/14 Tr., at 46:19-24. Sometime in 1991, LIB relocated its operations from the 596 Property to a facility located at 28 William Street, Lynbrook, New York. *Id.* at 46:25-47:23; *see* Ench Test., 6/23/14 Tr., at 33:4-6, 34:11-13; Balducci Sr. Test, 7/17/14 Tr., at 69:22-70:2. After relocating, LIB continued to use the 596 Property periodically for storage and parking trucks, but not for any other operations. Ench Test., 6/23/14 Tr., at 24:7-9; 30:24-31:6.

LIB made rental payments on the 596 Property directly to Brook. *Id.* at 42:2-10. For example, LIB's bank statements show that Brook cashed checks for $1,600 in rental payments from LIB on November 14, 2013 and December 26, 2013. *See* LIB Citibank Statements, Pls.' Ex. 8; Centofranchi Test., 6/23/14 Tr., at 82:5-83:16. LIB's Payable Register also indicates that Brook "billed" LIB for $1,600 in rental expenses on January 1, 8, 15, 22, and 29, 2014. *See* LIB Payable Register, Pls.' Ex. 5; Ench Test., 6/23/14 Tr., 109:6-110:22.[11]

---

10. Ench testified that there has been no mortgage on the 596 Property since he started working as Brook's accountant in 1996. *See* Ench Test., 6/23/14 Tr., 40:19-21.

11. The "General Ledger Trial Balance" for LIB from October 1, 2012 to October 31, 2012 also includes an entry for a $62,454 "rent expense" that LIB booked as payable to

However, there was no lease agreement between Brook and LIB, and Ench testified that he did not know whether all the rental payments from LIB to Brook were in the amount of $1,600. Ench Test., 6/23/14 Tr., at 36:4-6, 102:13-14, 107:9-13; 110:23-25. Centofranchi also testified that he did not know how much or how often LIB paid rent to Brook. *See* Centofranchi Test., 6/23/14 Tr., at 75:11-12; 83:15-19.

### G. Brook's Income

From 2009 to 2012, Brook's income consisted solely of the gross rents it received from renting out the 596 Property to LIB and from renting out the 590 Property to outside tenants. *See* Ench Test., 6/23/14 Tr., at 30:14-18, 30:24-31:6, 39:15-17; Brook's 2009-2012 Fed. Tax Returns, Non-Debtor Defs.' Exs. H-K. However, the evidence presented at the hearing does not indicate how much of Brook's income derived from rental payments by LIB and how much derived from the rental payments by the tenants at the 590 Property. Both Ench and Centofranchi were questioned extensively on this topic, and neither accountant was able to itemize the sources of Brook's income other than to say that it derived from rental payments by both LIB and the 590 Property tenants. For example, in reviewing Brook's tax returns from 2009 to 2012, Ench confirmed Brook's gross rental income for each tax year, but stated that he did not know the "breakdown" of how much of the income was derived from rental payments from LIB as opposed to payments by tenants at the 590 Property. *See* Ench Test., 6/23/14 Tr., at 35:18-36:3, 37:4-22, 38:1-18, 39:21-24. Moreover, in reviewing the entries for "Rental Income" deposits listed in Brook's General Ledger for 2012, neither Ench nor

Centofranchi could determine whether those payments came from LIB or the 590 Property tenants. *See* Centofranchi Test., 6/23/14 Tr., at 77:11-80:11; 88:22-89:13.

Centofranchi also testified that in addition to paying rent, LIB loaned money to Brook "over the years." *Id.* at 84:2-3. Particularly, LIB's General Ledger Trial Balance for 2012 indicates that LIB loaned $60,500 to Brook. LIB General Ledger Trial Balance, Pls.' Ex. 4; *see* Centofranchi Test., 6/23/14 Tr., at 84:12-15. Centofranchi testified that he could not recall when this loan was first made or whether there was any consideration exchanged for the loan. Centofranchi Test., 6/23/14 Tr., at 85:10-20.

### H. Payment of Real Estate Taxes on the 596 Property

Brook paid the real estate taxes on both the 596 Property and the 590 Property. *See* Ench Test., 6/23/14 Tr., at 35:9-11. Ench testified that, between 2009 and 2012, the income Brook used to pay the real estate taxes came from a combination of rental payments from LIB and rental payments from the tenants at the 590 Property. *Id.* at 41:24-42:1. In other words, the real estate taxes were paid at least in part with the rental income Brook received from LIB. *See id.* at 36:15-18.

### I. Sale of the 596 Property

Brook sold the 596 Property to 596 Merrick LLC on April 1, 2014. *See* Apr. 1, 2014 Closing Statement, Pls.' Ex. 12. Alison Bretherick appeared at the closing and "signed" on behalf of Thomas Hoey, Jr. with his permission. Bretherick Test., 7/17/14 Tr., at 7:6-19. The total sale price for the 596 Property was $702,697 with a balance due at closing of $676,106.82. *See* Apr. 1, 2014 Closing Statement, Pls.' Ex.

Brook for that nine-month period. *See* LIB General Ledger Trial Balance, Pls.' Ex. 4; Centofranchi Test., 6/23/14, at 66:3-11. However, Centofranchi testified that, although this

entry represents a check that was written to Brook, Brook may never have cashed the check. *See* Centofranchi Test., 6/23/14, at 62:20-25, 63:4-10.

12. According to the April 1, 2014 Closing Statement, the "net proceeds" of the sale (the "Sale Proceeds") were distributed at the closing as follows: (1) $28,000 to Becker Realty; (2) to $50,000 to Brook; (3) $408,937.63 to Bretherick, (4) $27,000 to Lawrence A. Omansky IOLA,[12] (5) $10,000 to Attorney Omansky for his "legal fee"; and (6) $176,137.37 to Advantage Title Company. *See id.* Thus, in total, $700,075 in Sale Proceeds were distributed at the closing. *See id.*

## J. Location of the Proceeds from the Sale of the 596 Property

Bretherick testified regarding the location of the Sale Proceeds which were distributed at the closing to (1) Brook in the amount of $50,000, and (2) Bretherick in the amount of $408,937.63. *See generally* Bretherick Test., 7/17/14 Tr., at 9-49. Bretherick stated that she opened two checking accounts at Hudson Valley Bank—one in Brook's name bearing account number 2000728001 ("the Brook Account") and one in her name bearing account number 2000058806 ("the Bretherick Account") (collectively, "the Accounts"). *See id.* 9:9-11; Checks, Pls.' Ex. 13. Bretherick then deposited $50,000 in Sale Proceeds into the Brook Account and

$408,937.63 in Sale Proceeds into the Bretherick Account. Bretherick Test., 7/17/14 Tr., at 9:9-11. Bretherick further testified that, in addition to depositing the Sale Proceeds, she made other "limited" deposits into the Accounts, though she could not recall the exact amounts of those deposits. *See* Bretherick Test., 7/17/14 Tr., at 10:16-11:4, 22:7-17.

According to Bretherick, Thomas Hoey, Jr. directed her to open the Accounts and authorized her to "use the[ ] funds basically on his behalf." *Id.* at 25:5-12, 28:12-15. Bretherick further testified that she is not an "employee" or a "director" of Brook, but that she has "power of attorney with regard to that entity." *Id.* at 26:5-20.

During the hearing, Bretherick reviewed records of checks which had been written on the Accounts. *See generally id.* at 11–49; Checks, Pls.' Ex. 13.[13] Bretherick testified that Thomas Hoey, Jr. instructed her to write nearly all of the checks reflected in the bank records, though in some instances, she took it upon herself to make certain disbursements. *See* Bretherick Test., 7/17/14 Tr., 20:7-12, 29:14-25.

### 1. The Brook Account

According to the records entered into evidence during the hearing, the following checks were written on the Brook Account:

**12.** The April 1, 2014 Closing Statement notes that the $38,000 in proceeds which distributed to Becker Realty came out of the $55,000 that went into Attorney Omansky's IOLA account. *See* Apr. 1, 2014 Closing Statement, Pls.' Ex. 12.

**13.** Bretherick testified that she received the records of the checks from her bank and

produced those records to counsel for the Non-Debtor Defendants prior to the hearing. *See* Bretherick Test., 7/17/14 Tr., at 11:15-19. The records were filed on ECF as exhibits to the Declaration of Attorney Robert L. Rattet, *see* DE 119, and were later entered into evidence at the hearing as Plaintiffs' Exhibit 13. *See* 7/17/14 Tr., at 12.

| Check No. | Date | Payee | Amount |
|-----------|------|-------|--------|
| 311 | April 7, 2014 | Alison Bretherick | $540 |
| 313 | April 9, 2014 | Driscoll & Redlich | $40,000 |
| 323 | April 22, 2014 | Alison Bretherick | $5,000 |
| 1001 | April 25, 2014 | Alison Bretherick | $5,000 |
| 1002 | April 25, 2014 | Fischetti and Malgieri | $25,000 |
| 1003 | May 2, 2014 | Alison Bretherick | $975 |
| 1004 | May 15, 2014 | Alison Bretherick | $975 |
| **TOTAL:** | | | **$77,490** |

*See* Checks, Pls.' Ex. 13. Bretherick testified that, in addition to the checks reflected in the bank records, she may have written an additional check on the Brook Account for $750. Bretherick Test., 7/17/14 Tr., at 11:9-11. Bretherick estimated that approximately $10,000 to $12,000 remains in the Brook Account. *See id.* at 20:16-19, 25:18-21.[14]

As noted above, a majority of the checks written on the Brook Account were to Bretherick. Regarding the purposes of these checks, Bretherick testified that (1) check numbers 311 and 323 were used for personal expenses like gas, tolls, groceries, and cable and utility bills; (2) check numbers 1003 and 1004 were used to pay for hotel rooms for Thomas Hoey, Jr.'s crimi-

nal defense attorneys, LaRusso and Conway, and to pay charges on Bretherick's personal credit card bill, and (3) check number 1001 was never cashed. *Id.* at 13:7-25, 14:3-15; 34:12-21, 35:6-15. Bretherick further testified that check number 1002 was written to Fischetti and Malgieri to pay for Thomas Hoey, Jr.'s "criminal defense." *Id.* at 14:6-8. Finally, Bretherick testified that, although check number 313 was issued to Driscoll & Redlich for a "lawyer retainer," she believed the check was "never used" and was "never cashed." *Id.* at 13:15-20; 23:10-20.

### 2. The Bretherick Account

According to the records reviewed by Bretherick during the hearing, the following checks were written on the Bretherick Account:

---

**14.** Bretherick could not explain how funds remained in the Brook Account when, according to her testimony and the records she reviewed during the hearing, the amount of funds withdrawn from the Brook Account exceeded the amount of funds deposited into that account. *See* Bretherick Test., 7/14/17 Tr., at 25:18-26:4.

| Check No. | Date | Payee | Amount |
|---|---|---|---|
| 0093 | April 3, 2014 | Goetz Fitzpatrick | $25,000 |
| 310 | April 7, 2014 | Alison Bretherick | $6,537 |
| 319 | April 7, 2014 | Law Office of Eric Franz | $100,000 |
| 095 | April 9, 2014 | Karp Auto | $500 |
| 0094 | April 3, 2014 | Herrick Feinstein | $35,000 |
| 0096 | April 8, 2014 | Yolanda Hoey | $1,000 |
| 318 | April 11, 2014 | Law Office of Eric Franz | $100,000 |
| 0098 | April 11, 2014 | Karp Auto | $240.94 |
| 322 | April 22, 2014 | Alison Bretherick | $7,200 |
| 102 | April 25, 2014 | Alison Bretherick | $5,000 |
| 104 | April 25, 2014 | Alison Bretherick | $4,000 |
| 317 | April 22, 2014 | Fischetti and Malgieri | $25,000 |
| 101 | April 23, 2014 | T&M Protection Services | $9,000 |
| 103 | April 25, 2014 | Herrick Feinstein | $20,000 |
| 106 | April 14, 2016 | Marie Hoey | $5,000 |
| 0099 | April 15, 2014 | T&M Protection Services | $9,000 |
| 108 | May 15, 2014 | Brian Kupchik | $2,500 |
| 107 | May 15, 2014 | Brian Kupchik | $2,500 |
| 110 | May 23, 2014 | Alison Bretherick | $2,500 |
| 109 | May 21, 2014 | Yolanda Hoey | $1,000 |
| 111 | June 16, 2014 | Goetz Fitzpatrick | $15,000 |
| 112 | June 18, 2014 | Ellen Bruno | $1,018.50 |
| **TOTAL:** | | | **$376,996.44** |

*See* Checks, Pls.' Ex. 13. In addition to the checks reflected in the records, Bretherick testified that she wrote three additional checks on the Bretherick Account to (1) Law Office of Eric Franz in the amount of $5,000, (2) Fischetti and Malgieri in the amount of $8,500, and (3) herself in an unknown amount to pay her rent for July 2014. *See* Bretherick Test., 7/17/14 Tr., at 15:18-25.[15] Bretherick estimated that approximately $10,000 remains in the Bretherick Account. *See id.* at 20:20-23.

According to Bretherick, the "majority" of the checks written on the Bretherick Account were paid to attorneys handling Thomas Hoey, Jr.'s affairs. *See* Bretherick Test., 7/17/14 Tr., at 20:20. Specifically, Bretherick testified that the checks issued to Goetz Fitzpatrick and Herrick Feinstein were to pay Thomas Hoey, Jr.'s "business attorneys" while the checks issued to the

Law Office of Eric Franz and Fischetti and Malgieri covered legal fees related to Thomas Hoey, Jr.'s "criminal defense." *See, e.g., id.* at 16:2-5, 19-23, 17:10-13, 18:6-17. Similarly, the checks issued to T&M Protection Services were for Thomas Hoey, Jr.'s "investigators" and the check to Ellen Bruno was payment for trial transcripts. *See, e.g., id.* at 18:10-13, 19:2-5, 19:20-22. Bretherick also testified that Thomas Hoey, Jr. instructed Bretherick to write the checks to Hoey's sister, Yolanda Hoey, and his mother, Marie Hoey. *See, e.g., id.* at 18:18-25, 19:14-16, 26:1, 39:21-40:10. The remaining checks were used to pay for Bretherick's personal expenses—such as her rent, car lease payments, credit card charges, groceries, and utility bills, among other things—as well as some "limited" business expenses. *See, e.g., id.* at 17:18-24, 37:23-38:4, 38:13, 40:16-42:4, 43:22-44:20.

15. Bretherick testified that, although it was not reflected in the records, she believed she wrote a $1,500 check to Fairmount Insurance to cover the insurance payment on one of Brook's properties. *See* Bretherick Test., 7/17/14 Tr., at 30:2-21. However, Bretherick could not recall which one of the Accounts the check was drawn from. *See id.* at 30:22-25.

## IV. CONCLUSIONS OF LAW

### A. PACA Background

"Congress enacted PACA in 1930 to regulate the interstate sale and marketing of perishable agricultural commodities." *Coosemans Specialties, Inc. v. Gargiulo,* 485 F.3d 701, 705 (2d Cir.2007) (citing *Am. Banana Co., Inc. v. Republic Nat'l Bank of New York,* 362 F.3d 33, 36 (2d Cir. 2004)); *see R Best Produce, Inc. v. Shulman–Rabin Mktg. Corp.,* 467 F.3d 238, 241 (2d Cir.2006) (citing H.R. Rep. No. 98–543, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406)). "In 1984, Congress amended PACA 'by adding Section 499e(c), which requires licensed dealers to hold all perishable commodities purchased on short-term credit, as well as sales proceeds, in trust for the benefit of unpaid sellers.'" *Jacob's Vill. Farm Corp. v. Yusifov,* No. 14–CV–4109, 2015 WL 5693706, at *5 (E.D.N.Y. Sept. 28, 2015) (quoting *Am. Banana,* 362 F.3d at 37); *see Coosemans Specialties,* 485 F.3d at 705. Section 499e(c) provides, in relevant part, as follows:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2).

■ "The purpose of the [PACA] trust is 'to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by

them.'" *R Best Produce,* 467 F.3d at 241 (quoting H.R. Rep. No. 98–543, at 2 (1983)); *see Coosemans Specialties,* 485 F.3d at 705 ("The statute provides growers and sellers of agricultural produce with 'a self-help tool enabling them to protect themselves against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables.'") (quoting *D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.,* 411 F.3d 90, 93 (2d Cir.2005)); *see also Jacob's Vill. Farm,* 2015 WL 5693706, at *5 ("[A]s the Second Circuit has recognized, 'the legislative history and the text of PACA as well as the implementing regulations all make clear that [PACA] trust assets are intended exclusively to benefit produce suppliers.'") (quoting *R Best Produce,* 467 F.3d at 242) (alteration omitted). Accordingly, Section 499e(c)(2) imposes "a non-segregated floating trust" on the produce buyer's perishable commodities and their derivatives, and, in turn, affords produce sellers "a highly unusual trust beneficiary status that permit[s] them, in the case of defaults, to trump the buyers' other creditors, including secured ones." *Am. Banana,* 362 F.3d at 38; *see A & J Produce Corp. v. Bronx Overall Econ. Dev. Corp.,* 542 F.3d 54, 57–58 (2d Cir.2008) (quoting *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,* 67 F.3d 1063, 1067 (2d Cir.1995)).

■ Under ordinary principles of trust law, which apply in PACA actions, "the Produce Debtor holds the legal title to the Produce and its derivatives or proceeds but the seller retains an equitable interest in the trust property pending payment." *In re Kornblum & Co., Inc.,* 81 F.3d 280, 284 (2d Cir.1996); *see R Best Produce,* 467 F.3d at 242; *Jacob's Vill. Farm,* 2015 WL 5693706, at *5 ("PACA trusts are governed by general principles of trust law 'unless such law directly conflicts with the PACA

statute.'") (quoting *D.M. Rothman*, 411 F.3d at 94). Thus, in the event of the produce buyer's bankruptcy, "the Bankruptcy Code excludes PACA trust assets from the bankruptcy estate." *In re Kornblum*, 81 F.3d at 284; *see, e.g., Weis–Buy Farms, Inc. v. Quality Sales LLC*, No. 11–CV–2011, 2012 WL 280617, at \*10 (D.Conn. Jan. 31, 2012); *Atl. Tropical Produce Corp. v. El Nene Meat & Food Corp.*, No. 06–CV–2413, 2009 WL 436050, at \*5 (S.D.N.Y. Feb. 23, 2009), *aff'd sub nom. Atl. Tropical Produce Corp. v. AFS Capital, LLC ("AFS Capital")*, 356 Fed.Appx. 491 (2d Cir.2009); *see also In re Quality Sales, LLC*, No. 12–20008, 2013 WL 4482412, at \*1 (Bankr.D.Conn. Aug. 19, 2013) ("Because [PACA trust] property is held in trust, it is excluded from the property of the [PACA] Debtor's bankruptcy estate, making it unavailable for distribution to non-PACA claimants.") (citing 11 U.S.C. § 541(d)).

Under Section 499e(c)(2), a PACA trust "is formed at the moment the produce is shipped to the buyer and remains in effect until the seller is paid in full." *Ger–Nis Int'l, LLC v. FJB, Inc. ("Ger–Nis Int'l I")*, No. 07–CV–898, 2007 WL 656851, at \*1 (S.D.N.Y. Mar. 1, 2007) (citing *In re Kornblum*, 81 F.3d at 286); *see Horizon Mktg. v. Kingdom Int'l Ltd.*, 244 F.Supp.2d 131, 135 (E.D.N.Y.2003) (same); *Am. Banana Co. v. Republic Nat. Bank of N.Y., N.A.*, No. 99–CV–1330, 2001 WL 1132045, at \*1, n. 1 (S.D.N.Y. Sept. 25, 2001). Additionally, "a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full." *In re Kornblum*, 81 F.3d at 286; *see Bronx Overall*, 542 F.3d at 58 (noting that *Kornblum* "h[eld] that 'a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full.'") (quoting *In re Kornblum*, 81 F.3d at 286); *Coosemans Specialties*, 485 F.3d at 705 ("Under the relevant provision, perishable commodities or proceeds from the sale of those commodities are held in trust by the buyer for the benefit of the unpaid seller until full payment is made[.]"); *accord Ger–Nis Int'l, LLC v. FJB, Inc. ("Ger–Nis Int'l II")*, No. 07–CV–898, 2008 WL 2600074, at \*4 (S.D.N.Y. June 25, 2008) ("The PACA trust is continuous and exists from the moment produce is received until all suppliers are paid in full."). The PACA trust therefore "is not limited to the specific produce supplied by a particular seller or the proceeds from the sale of that specific produce." *Weis–Buy Farms*, 2012 WL 280617, at \*9 (citing *In re Kornblum*, 81 F.3d at 284); *see also Bronx Overall*, 542 F.3d at 58 (stating that *Kornblum* "rejected" the argument that the PACA trust terminates when the PACA creditors with claims as to goods sold prior to the acquisition of the disputed asset were paid in full).

Section 499e(c)(2) defines the corpus of the PACA trust "as all produce received from sellers, including 'all inventories of food or other products derived from' the produce, 'and any receivables or proceeds from the sale of such' produce or its derivative products." *R Best Produce*, 467 F.3d at 241 (quoting 7 U.S.C. § 499e(c)(2)). The Second Circuit has observed that "assets acquired with the cash proceeds of trust property ... [are] included among the 'proceeds' of [trust] property," and that "[t]he same result follows ... whether one views an asset purchased with the cash proceeds of a trust property as a second-generation 'proceed' (thereby falling within the statutory definition of trust property), or as the product of a wrongful dissipation of trust assets (thereby becoming a part of the trust by operation of law)." *In re Kornblum*, 81 F.3d at 285 n. 2 (citing *In re Al Nagelberg & Co. (Pereira v. Marine Midland Bank, N.A.)*, 84 B.R. 19, 20–21

(Bankr.S.D.N.Y.1988) (treating the issue of assets acquired with the cash proceeds of trust assets as a question of diversion of trust property); Restatement (Second) of Trusts § 202(1) (1959) ("Where the trustee by the wrongful disposition of trust property acquires other property, the beneficiary is entitled ... to enforce a constructive trust of the property so acquired ....")).

■ To prove that an asset is free of the PACA trust, the party taking that position must demonstrate that any one of the following factors applies:

That (1) no PACA trust existed when the [the property was] purchased; or that (2) even though a PACA trust existed at that time, [the property was] not purchased with trust assets; or that (3) although a PACA trust existed when [the property was] purchased and [the property was] purchased with trust assets the debtor thereafter paid all unpaid sellers in full prior to the transactions involving the [PACA] Creditors, thereby terminating the trust.

*In re Kornblum,* 81 F.3d at 287; *see, e.g., Bronx Overall,* 542 F.3d at 58; *D.M. Rothman Co. v. Cohen Mktg. Int'l, Inc.,* No. 98–CV–7905, 2005 WL 1690524, at *1 (S.D.N.Y. July 18, 2005) ("a non-PACA creditor can prevail over the PACA trust" by establishing one of the *Kornblum* factors). Generally, "the challenging party" bears the burden of proving that one of the *Kornblum* factors is satisfied and the disputed asset therefore is not part of the PACA trust. *Bronx Overall,* 542 F.3d at 58 (quoting *In re Kornblum,* 81 F.3d at 287); *accord Hop Hing Produces Inc. v. X & L Supermarket, Inc.,* No. 12–CV–1401, 2013 WL 1232948, at *7 (E.D.N.Y. Mar. 26, 2013) ("As a general matter it is the burden of the PACA debtor, or the person potentially holding the PACA assets, to establish that funds were not PACA assets."); *see also Ger–Nis Int'l II,* 2008 WL 2600074, at *4 (noting that the parties

taking the position "that an asset is free of the PACA trust"—in this case, the Non-PACA Claimants—have the burden of proving that the asset is not a PACA trust asset).

■ "PACA does not explicitly assign to third parties ... any responsibility for preserving a PACA trust." *E. Armata, Inc. v. Korea Commercial Bank of N.Y.,* 367 F.3d 123, 128 (2d Cir.2004). "However, under general trust principles applicable to PACA, a third party may be liable to PACA-trust beneficiaries, if the PACA trustee's 'transfer of funds to the third party constituted a breach of its duty as trustee to maintain trust assets,'" and "'the third party transferee ... had notice of the trustee's breach of trust.'" *E. Potato Dealers, Inc. v. TNC Packing Corp.,* No. 08–CV–6280, 2011 WL 2669632, at *12 (W.D.N.Y. July 7, 2011) (quoting *E. Armata,* 367 F.3d at 128, 129 n. 7); *see Chiquita Fresh N. Am., LLC v. Long Island Banana Corp.,* 27 F.Supp.3d 340, 345 (E.D.N.Y.2014) ("In analyzing whether a third party is liable for PACA debts, courts undertake a two-part analysis: 1) whether the transfer of assets was a breach of the PACA trust, and 2) whether the third party transferee should be liable for the breach." (citing, *e.g., Am. Banana,* 362 F.3d at 41 ("The first issue is whether the trustee is liable for dissipating the trust by using trust assets to pay non-PACA creditors. The second issue is whether the bank is liable for receiving funds ...")); *see Hop Hing,* 2013 WL 1232948, at *7 (same). "A PACA trustee may breach the trust in various ways, such as 'dissipation,' which includes 'any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions.'" *E. Potato Dealers,* 2011 WL 2669632, at *12 (quoting *E. Armata,* 367 F.3d at 129).

■ Moreover, trust principles protect bona fide purchasers from liability by allowing them "to retain trust property even if the property was transferred in breach of trust." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 615 (2d Cir.1998); *see E. Potato Dealers*, 2011 WL 2669632, at \*12. As the Second Circuit explained in *Albee Tomato*:

> To qualify as a bona fide purchaser, the transferee must take the property for value and without notice of breach of trust. A third-party transferee may escape liability, therefore, if it: (i) gave value for the trust property and (ii) had no actual or constructive notice of the breach of trust. In establishing the protected status of bona fide purchaser, the burden of proof is on the transferee.

155 F.3d at 615 (internal quotation marks and citations omitted); *see E. Potato Dealers*, 2011 WL 2669632, at \*13 ("[A] third-party bona fide purchaser who receives PACA trust property is not liable to the PACA trust beneficiaries."); *see generally* Restatement (Third) of Trusts § 108(2) (2012) ("A third party who acquires an interest in trust property through a breach of trust is entitled to retain or enforce the interest to the extent the third party is protected as a bona fide purchaser."). "[U]nder general principles of trust law, a transferee has the requisite constructive knowledge when it 'should know' of the breach of trust." *Albee Tomato*, 155 F.3d at 616 (citing Restatement (Second) of Trusts § 297 (1959)) (citation omitted); *see also Boston Tomato & Packaging, LLC v. Bostonia Produce, Inc.*, 98 F.Supp.3d 268, 273 (D.Mass.2015) ("The more recent Restatement (Third) of Trusts continues to disqualify bona fide purchaser status based on constructive knowledge that the trustee is acting improperly, but eliminates the transferee's duty of inquiry.") (citing Restatement (Third) of Trusts § 108(1) (2012)) (internal citations omitted).

**B. Discussion**

Judge Spatt referred Plaintiffs' motion to this Court to determine (1) whether the 596 Property is a PACA asset subject to the Consent Injunction; (2) the present location of the Sale Proceeds; and (3) "any other issues which may be relevant." Apr. 7, 2014 Order. Before considering these issues, the Court will address some preliminary matters raised in the Non-Debtor Defendants' Proposed Findings of Fact and Conclusions of Law.

First, the Non-Debtor Defendants argue that Brook is "a non-PACA licensed entity engaged solely in the non-PACA regulated business of owning and renting property," a point which Plaintiffs do not directly contest. Non-Debtor Defs.' PFF&CL ¶ 37; *see generally* Pl.'s PFF&CL. Based on the evidence presented at the hearing, the Court concludes that Brook did not engage in a PACA-regulated business and is not an entity licensed under PACA, as the Non-Debtor Defendants assert. The Court further concludes that Brook is not a trustee of the PACA trust created by the sale of produce by LIB and/or Suffolk Banana. The Court points out, however, that the fact that Brook is not a PACA trustee does not preclude the Court from ultimately concluding (1) whether the 596 Property is a PACA trust asset subject to the Consent Injunction and, if so, (2) that Brook should be held liable to Plaintiffs for the Sale Proceeds it received. *See, e.g. Ger–Nis Int'l II*, 2008 WL 2600074, at \*4 (non-PACA claimant required to prove that asset in its possession was free of the PACA trust); *Mid–Valley Produce Corp. v. 4–XXX Produce Corp.*, 833 F.Supp. 193, 196 (E.D.N.Y.1993) (holding that a constructive trust had arisen on the residential home of the PACA debtor's wife, who the court found was "neither a trustee nor a wrongdoer," based on the wife having used PACA trust assets given to her by the

PACA debtor to pay the mortgage on the house); *see generally Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 595–96 (4th Cir.2010) ("[W]hen trust assets are held by a third party, resulting in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, the third party may be required to disgorge the trust assets unless the third party can establish that it has some defense, such as having taken the assets as a bona fide purchaser without notice of the breach of trust.") (citing *Endico Potatoes*, 67 F.3d at 1067–68; Restatement (Second) of Trusts § 284).

Second, the Non-Debtor Defendants assert that the Court "should refuse to consider any testimony or argument" regarding the Plaintiffs' claim that Brook is actually an alter ego of LIB and/or Suffolk Banana. Non-Debtor Defs.' PFF&CL ¶ 38. According to the Non-Debtor Defendants, "[s]uch claims belong to the Debtors' estates, and the Plaintiffs' usurpation of these claims would violate the automatic stay under section 362 of the Bankruptcy Code," which was in place at the time the Court conducted the evidentiary hearing on Plaintiffs' motion. *Id.* Although Plaintiffs do not make an alter ego argument in their Proposed Findings of Fact and Conclusions of Law, they have asserted an alter ego cause of action in their Amended Complaint. *See* Am. Compl. ¶¶ 43-58. Specifically, Plaintiffs assert that LIB, Suffolk Banana, Brook, HB Realty and Stuls "are alter egos of one another, entitling Plaintiffs to recover the PACA debt, jointly and severally, from each of the corporate defendants." *Id.* ¶ 58. In a Memorandum and Order issued on June 23, 2014—the first day of the evidentiary hearing—Judge Spatt declined to dismiss Plaintiffs' alter ego claim, stating that he could not resolve this claim as a matter of law "without a fuller record aided by discovery." *Chiquita Fresh N. Am.*, 27 F.Supp.3d at 346 [DE 116].

The Court notes that in light of the bankruptcy stay in place as to Debtor Defendants, it would have been improper for Plaintiffs to attempt to show at the evidentiary hearing that the 596 Property is a trust asset because Brook is an alter ego of LIB and/or Suffolk Banana. *See generally Cocoletzi v. Fat Sal's Pizza Corp.*, No. 15–CV–2696, 2015 WL 4655164, at *2 (S.D.N.Y. Aug. 5, 2015) ("A proceeding that asks whether a debtor has abused the corporate form to the plaintiff's detriment (*i.e.*, the alter ego theory) is a proceeding against the debtor, subject to the automatic stay.") (citing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir.1989)); *Jackson v. Corporategear, LLC*, No. 04–CV–10132, 2005 WL 3527148, at *3 (S.D.N.Y. Dec. 21, 2005) ("[W]hen New York law applies, a bankruptcy trustee has 'standing to assert claims based upon piercing the corporate veil or alter ego liability, and creditors are precluded from pursuing those claims until they have been abandoned.' ") (quoting *In re Keene Corp.*, 164 B.R. 844, 852 (Bankr.S.D.N.Y. 1994)). However, Plaintiffs did not attempt to make such a showing at the hearing, nor have they advanced alter ego liability as a basis for this Court to rule in their favor. *See generally* Pls.' PFF&CL. Moreover, the Court need not "refuse to consider" evidence presented at the hearing simply because that evidence may be construed as supporting the alter ego cause of action alleged in the Amended Complaint, which Judge Spatt has thus far declined to dismiss. *Chiquita Fresh N. Am.*, 27 F.Supp.3d at 346.[16]

---

**16.** Finally, the parties reported on May 13, 2015 that the bankruptcy stay has been lifted as to the PACA Escrow. DE 144. Thus, it appears that Plaintiffs are no longer prohibited under the bankruptcy law from pursuing

The Court will now address the issues set forth in Judge Spatt's Referral Order.

### 1. Whether the 596 Property Is a PACA Asset Subject to the Consent Injunction

■■■ The parties appear to agree that the question whether the 596 Property is a PACA trust asset subject to the Consent Injunction is governed by the three-factor test enunciated in *Kornblum*. *See* Non-Debtor Defs.' PFF&CL ¶¶ 41-42; Pls.' PFF&CL ¶ 29. The Non-Debtor Defendants, as the parties claiming that the 596 Property is not a PACA trust asset, bear the burden of establishing that one of the *Kornblum* factors applies here; namely, that either: (1) no PACA trust existed at the time the 596 Property was purchased; or (2) even if a PACA trust existed, the funds used to purchase the 596 Property were not trust assets, or (3) even if a PACA trust existed and the PACA trust funds were used to purchase the 596 Property, the Debtor Defendants thereafter paid all unpaid PACA sellers in full prior to their transactions with the Plaintiffs. *See, e.g., In re Kornblum*, 81 F.3d at 286; *Ger–Nis Int'l II*, 2008 WL 2600074, at *4.

#### a. Whether a PACA Trust Existed at the Time Brook Purchased the 596 Merrick Property

A PACA trust is created "at the moment the produce is shipped to the buyer." *Ger–Nis Int'l I*, 2007 WL 656851, at *1 (citing *In re Kornblum*, 81 F.3d at 286); *see* 7 U.S.C. § 499e(c)(2). The evidence adduced at the hearing demonstrates that Brook purchased the 596 Property and LIB from the Paolillo Brothers as part of the same transaction on June 10, 1986. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1. Thus,

the 596 Property and LIB were purchased simultaneously. There appears to be no dispute that LIB and Suffolk Banana engaged in the business of buying and selling wholesale quantities of produce, ultimately creating the PACA trust at issue in this litigation. *See* Balducci Sr. Test, 7/17/14 Tr., at 55:24-56:7; Non-Debtor Defs.' PFF&CL ¶ 3. However, the Non-Debtor Defendants did not present any evidence which establishes exactly *when* that PACA trust was created—*i.e.*, when LIB and/or Suffolk Banana received its first shipment of produce as a commissioned PACA dealer. *See* 7 U.S.C. § 499e(c)(2). In particular, it is unclear to the Court whether (1) the PACA trust was *already in existence* when Brook purchased all of the stock in LIB and the 596 Property from the Paolillo Brothers on June 10, 1986, or (2) the PACA trust came into existence *sometime after* the June 10, 1986 transaction. The Non-Debtor Defendants simply did not offer any evidence on this issue, nor do they address it in their Proposed Findings of Fact and Conclusions of Law. *See* Non-Debtor Defs.' PFF&CL.

The Court further points out that, although the Non-Debtor Defendants emphasize that the Plaintiffs' PACA claims did not arise until 28 years after Brook purchased the 596 Property in June 10, 1986, *see id.* ¶ 37, that fact is irrelevant to the question of whether the PACA trust existed at the time Brook purchased the property. It is settled law in this Circuit that "[t]he PACA trust is continuous and exists from the moment produce is received until all suppliers are paid in full." *Ger–Nis Int'l II*, 2008 WL 2600074, at *4; *see In re Kornblum*, 81 F.3d at 286 ("[A] single PACA trust exists for the benefit of

---

their alter ego cause of action against LIB, Suffolk Banana, Brook, HB Realty, and Stuls. *See, e.g., Jackson*, 2005 WL 3527148, at *3. The parties have not addressed what effect, if any, the lifting of the stay should have on this

Court's recommended disposition of the 596 Property. Ultimately, since Plaintiffs have not advanced an alter ego argument in support of their position, the Court need not address this question.

all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full.") (footnote omitted). As the Second Circuit made clear in *Kornblum*, a PACA creditor may recover trust assets acquired **before** the PACA debtor's transactions with that particular PACA creditor. *See* 81 F.3d at 286; *see also Weis–Buy Farms*, 2012 WL 280617, at *9 ("[The PACA trust] is not limited to the specific produce supplied by a particular seller or the proceeds from the sale of that specific produce."). Accordingly, the date when Plaintiffs' PACA claims arose has no bearing on the question of whether the trust existed when Brook purchased the 596 Property in June 1986. Likewise, to the extent that the Non-Debtor Defendants attempt to assert that Plaintiffs cannot reach the proceeds of the 596 Property because Brook purchased that property **before** Plaintiffs' PACA transactions with the Debtor Defendants, the Second Circuit expressly rejected that argument in *Kornblum*. *See* 81 F.3d at 286 (holding that it was "inappropriate" for the district court "to enter summary judgment against the Creditors on the basis that Kornblum had acquired the [property] prior to its transactions with the Creditors," and remanding the case to the district court for further proceedings).

Ultimately, to prevail under the first *Kornblum* factor, the burden is on the Non-Debtor Defendants to prove that the PACA trust did not exist when Brook purchased the 596 Property. *See id.* at 287. The Non-Debtor Defendants have failed to meet that burden here and, in any event, they do not even appear to contend that the first *Kornblum* factor has been satisfied in this case. *See Ger–Nis Int'l II*, 2008 WL 2600074, at *4. Because the Non-Debtor Defendants have not satisfied the first *Kornblum* factor, they must demonstrate either that (1) the 596 Property was not purchased with PACA trust assets, or (2) even if the property was purchased with

trust assets, the trust had been terminated prior to Plaintiffs' transactions with the Debtor Defendants. *See In re Kornblum*, 81 F.3d at 287.

### b. Whether Brook Purchased the 596 Property with PACA Trust Assets

The Court now turns to the thorniest issue between the parties: whether the 596 Property was purchased with PACA trust assets. *See id.* The Non-Debtor Defendants argue that 596 Property was not purchased with PACA assets because Brook used the Business Partners' "personal funds" to purchase the property on the June 10, 1986. Non-Debtor Defs.' PFF&CL ¶¶ 37, 45. Plaintiffs do not appear to dispute that the money Brook paid at the June 10, 1986 closing did not derive from the sale of produce. *See generally* Pls.' PFF&CL. Plaintiffs nevertheless contend that the 596 Property is a PACA trust asset because Brook used the proceeds from LIB's sale of produce to pay the mortgage on the 596 Property, as well as the real estate taxes and other carrying costs in connection with Brook's ownership of the property. *See id.* ¶¶ 34-37.

Brook purchased the 596 Property, LIB, and Cargo from the Paolillo Brothers on June 10, 1986 for a total purchase price of $993,440. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1. According to the June 10, 1986 Closing Statement, Brook paid $300,000 of the purchase price using (1) a $25,000 down payment, and (2) a certified check for $275,000. *See id.* Thomas Hoey, Sr. testified that he and the other Business Partners did not use "banana money" to purchase the 596 Property and LIB because they were not running a PACA business at the time of the acquisition. Hoey Sr. Test., 6/23/14 Tr., at 46:16-18; 55:9-19. Rather, Hoey Sr. testified that he contributed his "savings" toward the purchase. *See id.* at 46:9. In light of this testimony, which the Court finds credible, the Court

concludes that the $300,000 Brook paid to the Paolillo Brothers at the June 10, 1986 closing did not derive from PACA funds.

The Court's inquiry does not end there, however, since Plaintiffs contend that the 596 Property may still be considered a PACA trust asset because Brook used the proceeds from LIB's sale of produce (1) to pay off the mortgage on the 596 Property, and (2) to pay the real estate taxes and other carrying costs. *See* Pls.' PFF&CL ¶¶ 34-37.[17] The Court considers these contentions in turn.

### i. Mortgage Payments

As an initial matter, the Court must determine whether Brook used PACA funds to pay the mortgage on the 596 Property. The evidence presented at the hearing showed that: (1) on June 10, 1986, Brook gave the Paolillo Brothers a 10-year mortgage on the 596 Property to cover $693,444 of the purchase price for the 596 Property, LIB, and Cargo; and (2) Brook satisfied the mortgage on October 10, 1995. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1; Mortgage Satisfaction, Non-Debtor Defs.' Ex. G. As the Non-Debtor Defendants note in their Proposed Findings of Fact and Conclusions of Law, the mortgage Brook gave the Paolillo Brothers was a purchase-money mortgage. *See* Non-Debtor Defs.' PFF&CL ¶ 20 ("A purchase money mortgage was given to the Paolillo Brothers by Brook as part of the acquisition of LIB and the 596 Merrick Property, and that mortgage was satisfied in 1995 …"); *see generally* Black's Law Dictionary (10th ed. 2014) (defining "purchase-money mortgage" as "[a] mortgage that a buyer gives the seller, when the property is conveyed, to secure the unpaid balance of the purchase price"). Notably, John Balducci testified that the funds used to pay off the mortgage were "created by the sale of bananas" by LIB. Balducci Sr. Test, 7/17/14 Tr., at 55:24-25; *see id.* at 56:1-7. In light of this unrebutted evidence, the Court concludes that Brook used PACA trust funds derived from the sale of produce by LIB to make monthly payments on (and eventually satisfy) the purchase-money mortgage on the 596 Property.

The question thus becomes whether the 596 Property was "purchased with trust assets" under the second *Kornblum* factor because Brook used PACA funds to pay off the purchase-money mortgage. *See In re Kornblum*, 81 F.3d at 287. The Second

---

17. Citing *Hop Hing*, the Non-Debtor Defendants assert that the Court's inquiry into the second *Kornblum* factor should, in fact, end with the conclusion that Brook paid the $300,000 at the June 10, 1986 closing using "personal funds and not PACA monies generated from the operations of LIB, because the partner did not operate LIB until 1986." Non-Debtor Defs.' PFF&CL ¶ 45 (citing *Hop Hing*, 2013 WL 1232948, at *7). In *Hop Hing*, the court determined that the PACA creditor plaintiffs could not recover the security deposit paid by the parent company of the PACA debtor to a third-party landlord because, *inter alia*, PACA operations did not begin at the rented premises until after the security deposit already had been paid. *See* 2013 WL 1232948, at *7. The *Hop Hing* court found that, at the time the security deposit was paid, "the funds used were not derived from transactions covered by PACA. Accordingly, the security deposit was not part of a PACA trust when it was paid under the lease." *Id.* It is unclear whether the court in *Hop Hing* reached this result because it determined that the first *Kornblum* factor had been satisfied; that is, that a PACA trust did not yet exist when the security deposit was paid. *See id.* (reciting *Kornblum* factors). That is not the case here, since the Non-Debtor Defendants have failed to show that the PACA trust did not exist when Brook purchased the 596 Property. In any event, the Court finds that *Hop Hing* is otherwise distinguishable because it involved only a single payment—a security deposit—whereas here, Plaintiffs have asked the Court to consider whether the 596 Property can be considered a trust asset by virtue of multiple payments Brook made toward that property after the June 10, 1986 closing.

Circuit's decision in *Kornblum* offers guidance on this issue. There, the disputed assets were membership certificates and proprietary leases for units in a cooperative or co-op building ("the Units") purchased by the PACA debtor, Kornblum. *See id.* at 282. Prior to filing for bankruptcy, Kornblum paid $1,050 per month in maintenance fees on the Units. *See id.* The Second Circuit held that the district court erred in concluding that the Units could not be PACA trust assets simply because "Kornblum had acquired the Units prior to its transactions with the [PACA] Creditors," and it remanded the case to the district court on that basis. *Id.* However, the Second Circuit also noted that it agreed with the district court "that Kornblum's monthly maintenance payments for the Units constitute the functional equivalent of rent, and accordingly should not be deemed to have been made to *acquire* the Units. Thus, the Units did not become trust property by virtue of those payments." *Id.* at 286 n. 4 (emphasis supplied). In other words, even assuming Kornblum used PACA funds to make the monthly maintenance payments, the Second Circuit determined that the fact that those payments were not made to "acquire" the Units meant that the Units "did not become trust property by virtue of those payments." *Id.*

The Court finds the final footnote in *Kornblum* significant because it indicates that, where payments derived from PACA trust funds are "made to acquire" an asset, that asset "may become trust property by virtue of those payments." *See id.* This notion comports with a general principle of trust law, cited in *Kornblum*, which allows a beneficiary to enforce a constructive trust or an equitable lien upon real property which is acquired "by the wrongful disposition of trust property." *See id.* at 285 n. 2 (citing Restatement (Second) of Trusts § 202(1)). Moreover, the Second Circuit stated in *Kornblum* that "assets acquired

with the cash proceeds of trust property [are] ... included among the 'proceeds' of that property" regardless of "whether one views the acquired asset as a second-generation 'proceed' (thereby falling within the statutory definition of trust property), or as the product of a wrongful dissipation of trust assets (thereby becoming a part of the trust by operation of law)." *Id.* (citations omitted)

Applying these principles here leads to the conclusion that Brook's payments on the purchase-money mortgage were "made to acquire" the 596 Property. *Id.* at 286 n. 4. The Restatement (Third) of Property defines a "purchase money mortgage" as "a mortgage given to a vendor of the real estate or to a third party lender to the extent that the proceeds of the loan are used to ... *acquire* title to the real estate." Restatement (Third) of Property (Mortgages) § 7.2 (1997) (emphasis supplied); *see id.* cmt. c ("A mortgage qualifies for this status to the extent that its proceeds are used to acquire title to the mortgaged real estate. Thus, where the proceeds are used in their entirety to acquire Blackacre, the full amount of the mortgage loan will qualify as a purchase money mortgage.").

New York courts have adopted a similar definition. *See, e.g., In re Merhi*, 518 B.R. 705, 718 (Bankr.E.D.N.Y.2014) ("'A purchase-money mortgage is generally defined as a mortgage executed at the time of purchase of the land and contemporaneously with the acquisition of the legal title, or afterward, but as a part of the same transaction to secure an unpaid balance of the purchase price.'") (quoting *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 47, 499 N.Y.S.2d 650, 653, 490 N.E.2d 517, 520 (1986)); *Yankee Bank for Fin. & Sav., FSB v. Task Associates, Inc.*, 139 B.R. 71, 87 n. 37 (N.D.N.Y.1992) (same). Here, the evidence before the Court shows that (1) Brook gave the Paolillo Brothers a pur-

chase-money mortgage on the 596 Property to secure the unpaid balance of $693,000, and in turn, (2) Brook used the proceeds of the mortgage loan to "acquire" the 596 Property by paying off the mortgage to the Paolillo Brothers. *See* Restatement (Third) of Property (Mortgages) § 7.2. Moreover, according to the Closing Statement, the purchase price for the 596 Property was $782,000. *See* June 10, 1986 Closing Statement, Pls.' Ex. 1. Since the $300,000 cash payment and the purchase-money mortgage were the only consideration Brook gave to the Paolillo Brothers at the closing, Brook would not have been able to acquire the 596 Property without the purchase-money mortgage.

For these reasons, the Court finds that, unlike the monthly maintenance payments in *Kornblum*, Brook's payments on the purchase-money mortgage were "made to acquire" the 596 Property. *Kornblum*, 81 F.3d at 286, n. 4. Additionally, because Brook used PACA funds to make the mortgage payments, the 596 Property was "purchased with trust assets" pursuant to the second *Kornblum* factor. *Id.* at 287. Guided by *Kornblum*, the Court reaches this result regardless of whether it considers the 596 Property a "second-generation proceed" of the PACA trust or as property acquired "as the product of a wrongful dissipation of trust assets." *Id.* at 285 n. 2.

The Non-Debtor Defendants take an opposing view of *Kornblum*, arguing that the final footnote supports their position that the mortgage payments did not "convert" the 596 Property into a PACA asset. *See* Non-Debtor Defs.' PFF&CL ¶¶ 37, 47. The Non-Debtor Defendants contend that "[t]he Second Circuit instructs in *Kornblum* [that] an asset does not become trust property by virtue of mortgage payments

made from rent." *Id.* ¶ 47 (citing *Kornblum*, 81 F.3d at 286 n. 4). Noting that the evidence at the hearing showed that "Brook derived all income from rent and paid all its own expenses, including the mortgage loan to Paolillo Brothers," *id.*, the Non-Debtor Defendants argue that "[e]ven if mortgage payments made by Brook (a non-PACA licensed entity engaged solely in the non-PACA regulated business of owning and renting property) in connection with the 596 Merrick Property were derived from LIB's funds, those funds constitute rents paid by LIB to Brook," and the 596 Property therefore did not become trust property by virtue of the mortgage payments. *Id.* ¶ 37.

The Court disagrees. Contrary to the Non-Debtor Defendants' contentions, *Kornblum* does not state that "an asset does not become trust property by virtue of mortgage payments made from rent." *Id.* ¶ 47. Indeed, *Kornblum* did not even involve mortgage payments nor does the Second Circuit's decision address whether the monthly maintenance payments on the Units derived from rental income. *See Kornblum*, 81 F.3d at 286, n. 4. Nevertheless, the Non-Debtor Defendants' argument appears to be that, like the monthly maintenance payments in *Kornblum*, the mortgage payments on the 596 Property should be treated as "the functional equivalent of rent" because they derived from rent paid by LIB to Brook. *See* Non-Debtor Defs.' PFF&CL ¶¶ 37, 47. *Kornblum* does not support this proposition, however, since there is no indication that the Second Circuit considered the monthly maintenance payments on the Units "the functional equivalent of rent" because the payments derived from rental income. *See Kornblum*, 81 F.3d at 286 n.4.[18] Moreover,

---

18. Rather, the Second Circuit indicated that it agreed with the district court that Kornblum's monthly maintenance payments on the Units constituted the functional equivalent of rent because the maintenance payments "had been made in the ordinary course of business." *Id.*

the Non-Debtor Defendants have not cited any other legal authority to support the notion that mortgage payments should be treated as "the functional equivalent of rent" merely because the monies used to make the mortgage payments came from rental income. *Cf. Anthony Marano Co. v. J & S Produce Corp.*, No. 12 C 1906, 2014 WL 4922324, at *12 (N.D.Ill. Sept. 30, 2014) (rejecting the defendant's arguments that "payments on the mortgage loan did not violate PACA because those payments 'were really just its rent payments'" as unsupported by the record evidence and noting the defendants "did not cite any case law for the proposition that rent payments are not subject to disgorgement by PACA trust beneficiaries"). Finally, the Non-Debtor Defendants do not address at all whether the mortgage payments were "made to acquire" the 596 Property, as *Kornblum* implies. 81 F.3d at 286 n. 4.

The Non-Debtor Defendants next argue that "even if payments on Brook's mortgage with rental income from LIB and third parties could somehow convert the [596 Property] ... into a PACA asset, that mortgage was fully paid off almost 20 years ago, extinguishing any right the Plaintiffs may be able to assert against the property." Non-Debtor Defs.' PFF&CL ¶ 37. According to the Non-Debtor Defendants, *Mid–Valley Produce Corp. v. 4–XXX Produce Corp.*, 833 F.Supp. 193 (E.D.N.Y.1993)—a case also relied on by Plaintiffs—supports this assertion. *See* Non-Debtor Defs.' PFF&CL ¶ 46; *see also* Pls.' PFF&CL ¶ 31 (citing *Mid–Valley*). In *Mid–Valley*, the plaintiffs brought an action against 4-XXX Produce Corp. ("4-XXX"), Philip Melfi, and Alice Melfi pursuant to PACA to recover payment for $185,012.32 of potatoes sold to 4-XXX by plaintiffs between March 27, 1991 and September 9, 1991. *See* 833 F.Supp. at 194. The district court granted the plaintiff's

motion for summary judgment against 4-XXX and Philip Melfi for the full amount of PACA trust funds, and thereafter held a trial regarding the liability of Philip Melfi's wife, Alice Melfi, for the PACA trust funds. *See id.* At trial, the plaintiffs "attempted to show that moneys which comprised (1) a $250,000 loan, purportedly from 4-XXX to Alice Melfi, and (2) salaries and commissions paid by 4-XXX to Philip Melfi were derived from PACA trust funds and can be traced to a bank account and to a house, both owned by Alice Melfi." *Id.* The plaintiffs "contend[ed] that a constructive trust arose upon Alice Melfi's house and bank account as a result of these transactions." *Id.*

Based on the evidence presented at trial, the court concluded, as relevant here, that the plaintiffs "established that Alice Melfi used $2,800 a month in 4-XXX PACA trust funds to pay the mortgage on her house." *Id.* at 196. However, the court noted that, "[c]learly, Plaintiffs have no claim to any such payments before March 27, 1991, the date on which they first sold the potatoes to 4-XXX for which they have not been paid." *Id.* The court ultimately found "that for eleven months, between April 1991 and February 1992, Alice Melfi paid the mortgage on her house with 4-XXX PACA trust proceeds, totaling $30,800." *Id.* The court therefore concluded that "a constructive trust has arisen on Alice Melfi's house ... to the extent of $30,800 and Plaintiffs are entitled to a lien on the house in that amount." *Id.*

The Non-Debtor Defendants argue that, under *Mid–Valley*, the 596 Property may not be considered a PACA trust asset by virtue of mortgage payments which Brook made before Plaintiffs' PACA claims arose. *See* Non-Debtor Defs.' PFF&CL ¶ 46. In particular, the Non-Debtor Defendants point out that, "[a]lthough the court in

at 283, 286 n. 4 (citing *In re Kornblum & Co.,* *Inc.,* 177 B.R. 187, 192 (S.D.N.Y.1995)).

*Mid–Valley* granted PACA creditors a lien on the home of the wife of a PACA trustee who used PACA funds to pay the mortgage on their home, the court refused to allow the PACA creditors any claim for mortgage payments that were made prior to the date the PACA claims of those creditors arose." *Id.* (citing *Mid–Valley*, 833 F.Supp. at 196). Applying this reasoning here, the Non-Debtor Defendants assert that because "the evidence clearly established that the mortgage on the 596 Merrick Property was paid off by 1995 and the Plaintiffs' PACA claims do not arise until November 2013," Plaintiffs "are not entitled to any claim against the 596 Merrick Property or any proceeds from the sale thereof" based on the mortgage payments. *Id.*

■■■ The Non-Debtor Defendants misconstrue the application of *Mid–Valley* given the Second Circuit's subsequent decision in *Kornblum*. Although the court in *Mid–Valley* determined that the plaintiffs had "no claim" to mortgage payments made before the plaintiffs "first sold the potatoes to 4-XXX for which they have not been paid," *see* 833 F.Supp. at 196, the continuing validity of that conclusion has been called into question by *Kornblum*. As discussed, *Kornblum* rejected the notion that the PACA trust *res* is limited to "only assets held in trust for a particular PACA beneficiary." 81 F.3d at 284. The Second Circuit instead held that "a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full," meaning that a PACA creditor can recover trust assets the PACA debtor acquired *before* the creditor's transactions with the debtor. *Id.* at 286; *see, e.g., Weis–Buy Farms*, 2012 WL 280617, at *9.

Ultimately, it is unclear from *Mid–Valley* whether the court determined that the plaintiffs in that case had "no claim" to mortgage payments made prior to their first transaction with 4-XXX because: (1) no PACA trust had yet been created at that time, *see* 7 U.S.C. § 499e(c)(2), or (2) the court believed the plaintiffs were not entitled to recover PACA trust assets which 4-XXX acquired prior to its transactions with the plaintiffs. *See* 833 F.Supp. at 196. To the extent the court's determination was the latter, *Mid–Valley* has been overruled, in part, by *Kornblum*, which was decided three years later. *See In re Kornblum*, 81 F.3d at 285–86. Applying the rule from *Kornblum*, the 596 Property may still be considered a PACA trust asset despite the fact that Brook paid off the mortgage on October 10, 1995, just over 18 years before the Plaintiffs' first PACA claim allegedly arose on November 27, 2013. *See id.*; Mortgage Satisfaction, Non-Debtor Defs.' Ex. G; Am. Compl. ¶ 6. In sum, the Court declines to rely on *Mid–Valley* for the proposition suggested by the Non-Debtor Defendants and instead concludes, based on *Kornblum*, that the 596 Property was "purchased by trust assets" based on the mortgage payments Brook made with PACA trust funds. *See In re Kornblum*, 81 F.3d at 286–87.[19]

### *ii. Real Estate Taxes and Other Carrying Costs*

■■■ Plaintiffs also assert that Brook used proceeds from the sale of produce by

---

**19.** The Court also notes that, setting aside the statement from *Mid–Valley* which may have been overruled, that case remains good law on the issue of, *inter alia*, a PACA creditor's ability to recover against the property of a third party based on mortgage payments made with PACA funds. *See* 833 F.Supp. at 196; *see also Am. Fruit & Vegetable Co. v. Ithaca Produce, Inc.*, 848 F.Supp.2d 375, 377 (W.D.N.Y.2011) ("[W]here a PACA trustee has improperly caused PACA trust funds to be diverted for the purpose of improving or paying for real property, PACA beneficiaries may seek to recover through a lien on the property.") (citing *Mid–Valley*, 833 F.Supp. at 196).

LIB to pay the "real estate taxes and other carrying costs" Brook incurred in connection with its ownership of the 596 Property. *See* Pls.' PFF&CL ¶ 35. Plaintiffs contend that Brook's payment of the real estate taxes and carrying costs "constitute the use of PACA funds to preserve and maintain the Premises" and resulted in the 596 Property "itself becoming a trust asset." *Id.* ¶¶ 35, 36.

As an initial matter, the Court points out that Plaintiffs have not specified what "carrying costs" they allege Brook paid using PACA funds. The Court therefore declines to reach any conclusions regarding the "carrying costs" in its consideration of whether the 596 Property was purchased with PACA trust assets.

As for the real estate taxes, Plaintiffs appear to assert that, because the funds Brook used to pay the taxes on the 596 Property derived from rental income Brook received from LIB—which in turn derived from the sale of produce—Brook used PACA trust funds to pay the real estate taxes. The evidence presented at the hearing established that Brook paid the real estate taxes using, in part, rental income it received from LIB for the 596 Property. *See* Ench Test., 6/23/14 Tr., at 35:9-11, 36:15-18, 41:24-42:1. The Court notes that contrary to the mortgage payments—which John Balducci unequivocally testified were paid using proceeds from the sale of produce by LIB—there is no record evidence before the Court showing that the rental payments LIB made to Brook were, in fact, paid with proceeds from the sale of produce. Without this evidence, the Court cannot as readily conclude that Brook's payments on the real estate taxes derived from PACA funds. That said, it is Brook who bears the burden of proving that assets it received from LIB, such as rental payments, are ***not*** trust property under 7 U.S.C. § 499e(c), and Brook has failed to meet that burden here. *See generally Bronx Overall*, 542 F.3d at 58; *Basciani Foods, Inc. v. Mid Island Wholesale Fruit & Produce, Inc.*, No. 09–CV–4585, 2011 WL 17524, at *3 (E.D.N.Y. Jan. 3, 2011) (citing *AFS Capital*, 356 Fed.Appx. at 492).

Even assuming Brook paid the real estate taxes on the 596 Property using PACA trust funds, the Court nevertheless concludes that the 596 Property was not "purchased with trust assets" by virtue of the real estate tax payments. *See In re Kornblum*, 81 F.3d at 287. Critically, unlike the purchase-money mortgage, Brook did not pay the real estate taxes in order "to acquire" the 596 Property. *See id.* at 286 n. 4. This finding is not contradicted by the legal authority cited by Plaintiffs. As discussed, PACA trust beneficiaries may be entitled to enforce either a constructive trust or an equitable lien against real property acquired by a third party with assets which were wrongfully diverted from the PACA trust and which can be traced to the acquired property. *See Am. Fruit & Vegetable*, 848 F.Supp.2d at 377 (citing *Mid–Valley*, 833 F.Supp. at 196); Restatement (Second) of Trusts § 202(1). Plaintiffs have not sought this relief, however. Specifically, they have not asked the Court (1) to impress a constructive trust on the Sale Proceeds, or (2) to enforce a lien against the Sale Proceeds, in the amount of PACA funds which were wrongfully diverted to Brook and which Brook then used to "preserve and maintain" the 596 Property.[20] *See* Restatement (Second) of Trusts § 202(1). Instead, Plaintiffs ask

---

**20.** Nor have Plaintiffs asserted an interest in the rental payments or loan LIB made to Brook. *See* LIB Citibank Statements, Pls.' Ex. 8; LIB Payable Register, Pls.' Ex. 5; LIB General Ledger Trial Balance, Pls.' Ex. 4; *see generally Morris Okun, Inc. v. Harry Zimmerman, Inc.*, 814 F.Supp. 346, 348–49 (S.D.N.Y. 1993).

the Court to conclude that the 596 Property "itself became a trust asset" by virtue of Brook's use of PACA funds to pay the real estate taxes. Pls.' PFF&CL ¶ 36. In light of *Kornblum*, the Court declines to make such a finding.

Based on the foregoing analysis, the Court concludes that the Non-Debtor Defendants have failed to meet their burden under the second *Kornblum* factor to demonstrate that the 596 Property was not purchased with PACA trust assets. *See In re Kornblum*, 81 F.3d at 287. Rather, the evidence shows that Brook used PACA trust funds to pay off the purchase-money mortgage on the 596 Property and, as a consequence, Brook acquired the 596 Property using PACA trust assets. *See id.*

### c. Whether the PACA Trust Was Terminated Prior to the Debtor Defendants' Transactions with Plaintiffs

Having failed to satisfy the first two *Kornblum* factors, the Non-Debtor Defendants must establish that, although a PACA trust existed when the 596 Property was purchased and that the property was purchased with trust assets, the Debtor Defendants "thereafter paid all unpaid sellers in full prior to the transactions involving the [Plaintiffs], thereby terminating the trust." *In re Kornblum*, 81 F.3d at 287. To this point, the Non-Debtor Defendants argue that the evidence presented at the hearing demonstrates that "[f]ollowing each change in ownership transaction in 1996, 1999, and 2003, accounts payable of LIB and Suffolk Banana, including the payables of PACA creditors, were paid as they became due in the ordinary course." Non-Debtor Defs.' PFF&CL ¶ 34. The Non-Debtor Defendants further point out that the documents relating to the 2003 Ownership Transaction "contemplate the sale of the ownership interests of the various companies free and clear of all claims and encumbrances, including PACA claims." *Id.* ¶ 33.

Plaintiffs argue that, contrary to the Non-Debtor Defendants' contentions, "LIB and Suffolk Banana never made any concerted effort to pay the PACA Creditors in full thereby terminating the PACA trust." Pls.' PFF&CL ¶ 19. Rather, Plaintiffs assert that "the accounts payable were merely paid in the ordinary course of business" at each change of ownership and "[a]t no time did LIB and Suffolk Banana terminate the PACA trust by paying all of their produce suppliers in full." *Id.* Plaintiffs also mention that "[t]he indemnification from 2003 is immaterial with regard to the existence of the PACA trust because LIB and Suffolk Banana had PACA trust debt at the time of the 2003 closing and continued to incur debt after the closing." *Id.* ¶ 49. On this issue, Plaintiffs point out that "LIB and Suffolk Banana had unpaid creditors on April 1, 2014" when the 596 Property was sold. *Id.* ¶ 20.

Having considered the evidence presented at the hearing, the Court finds that the Non-Debtor Defendants have not established that the Debtor Defendants terminated the PACA trust prior to their transactions with Plaintiffs by paying all of their unpaid suppliers in full. *See In re Kornblum*, 81 F.3d at 287. The parties seemingly agree that the evidence shows that when the Debtor Defendants changed ownership in 1999 and 2003, the accounts payables owed to their PACA produce suppliers were paid in the ordinary course of business and "remained as accounts payable." Centofranchi Test., 6/23/14 Tr., at 90:12-91:12; *see* Non-Debtor Defs.' PFF&CL ¶ 34; Pls.' PFF&CL ¶ 19. The Non-Debtor Defendants imply that this course of conduct indicates the Debtor Defendants paid their suppliers in full with each change of ownership. *See* Non-Debtor Defs.' PFF&CL ¶¶ 33-34. However, "paid in full" means that the produce debtor paid off all debt owed to its produce suppliers, not just the invoices which have come due. *See generally In re Kornblum*, 81 F.3d at 287.

The testimony presented at the hearing establishes that neither LIB nor Suffolk Banana paid their PACA suppliers in full as a consequence of the changes in ownership. John Balducci testified at several points that LIB and Suffolk Banana did not pay all of their PACA suppliers in full prior to his separation from the companies in 1999. Balducci Sr. Test., 7/17/14 Tr., at 67:10-68:19, 69:10-14; 72:16-21. Notably, Balducci testified that paying off all PACA liabilities prior to separating a business relationship is simply "not the way you do business." *Id.* at 68:3-4, *see id.* at 68:5-19.[21] Centofranchi further confirmed that for each change in ownership dating back to 1999, the accounts payable owed to the Debtor Defendants' PACA suppliers "weren't paid in full. They remained as accounts payable." Centofranchi Test., 6/23/14 Tr., at 91:5-9. The Court finds the following exchange between Centofranchi and Plaintiffs' counsel particularly compelling:

Q Do you know if there was any concerted effort by Long Island Banana or Suffolk Banana to pay all of the PACA suppliers in full so there was no outstanding debt to the produce suppliers?

A On that date when the [stock] transfer happened [in 1999]?

Q Correct.

A No. I'm a little confused.

When someone sells Google stock, you don't pay off the creditors. So I'm a little surprised I keep on getting these questions.

Q I understand. It's a legal issue, but we're here to discuss facts with you. Again, in 2003 when there was another stock transfer, there was no concerted effort by either Long Island or

Suffolk Banana to make sure that all the produce buyers were paid in full?

A Yes.

Q Because in 1999 and 2003, Long Island Banana was merely paying its produce suppliers where the invoices became due; is that correct?

A That is it correct.

*Id.* at 92:12-93:7.

Moreover, the indemnification agreements and provisions related to the 2003 Ownership Transaction do not establish that the PACA trust was terminated when James Balducci sold his interest in LIB, Suffolk Banana, and Brook to the Hoeys. *See* 2003 Ownership Transaction Docs., Non-Debtor Defs.' Exs. A1-A8. Although Forte stated that, to his knowledge, the indemnifications were intended to "cover any claims," including PACA liabilities, he testified on cross-examination that (1) the indemnifications were general in nature, and (2) he was not aware of any specific discussions among the parties to the 2003 Ownership Transaction regarding PACA claims or whether the Debtor Defendants' produce suppliers had been paid in full. Forte Test., 6/23/14 Tr., at 127:11-14, 128:6-25. Forte also testified that he did not know if any effort was made to pay off all of the produce suppliers, nor did he see any documents to that effect generated in connection with the 2003 closing. *See id.* at 129:10-17.

Ultimately, having credited the testimony of John Balducci and Centofranchi that the Debtor Defendants did not pay their produce suppliers in full with each ownership transaction, the Court finds that the indemnifications are not sufficient to establish that the Debtor Defendants terminated the PACA trust in 2003. The Court further points out that, even if the Non-

---

**21.** The Court credits this testimony given Balducci's status as a former principal of LIB, Suffolk Banana, and Brook, as well as his stated knowledge of the PACA. *See* Balducci Sr. Test., 7/17/14 Tr., at 57:8-58:9.

Debtor Defendants had made that showing, there was no attempt to demonstrate that the PACA trust remained "terminated"—that is, that LIB and Suffolk Banana continued to pay their produce suppliers in full from the 2003 Ownership Transaction all the way up to their first PACA transaction with Plaintiffs in November 2013. *See* Am. Compl. ¶ 6; *cf. Ger–Nis Int'l II*, 2008 WL 2600074, at *4 ("The Non-PACA Claimants also cannot demonstrate that all unpaid sellers have been paid, since the PACA Claimants are indisputably owed $127,073.95."). For these reasons, the Non-Debtor Defendants have not satisfied the third *Kornblum* factor.

In sum, the Court finds that, for the reasons set forth above, the Non-Debtor Defendants have not met their burden under *Kornblum* to show that the 596 Property is free of the PACA trust. *See In re Kornblum*, 81 F.3d at 287. Accordingly, the Court concludes that the 596 Property is a PACA asset subject to the Consent Injunction.

### 2. The Present Location of the Proceeds from the Sale of the 596 Property

Having determined that the 596 Property is PACA asset, the Court now turns to the issue of the location of the Sale Proceeds. *See* Apr. 7, 2014 Order. As discussed, Brook sold the 596 Property on April 1, 2014 for $702,697. *See* Apr. 1, 2014 Closing Statement, Pls.' Ex. 12. At the closing, $700,075 in proceeds from the sale were distributed as follows: (1) $28,000 to Becker Realty; (2) to $50,000 to Brook; (3) $408,937.63 to Bretherick, (4) $27,000 to Lawrence A. Omansky IOLA, (5) $10,000 to Attorney Omansky; and (6) $176,137.37 to Advantage Title Company. *See id.* Bretherick then deposited Brook's $50,000 in proceeds into the Brook Account and the $408,937.63 in proceeds distributed to her into the Bretherick Account. *See* Bretherick Test., 7/17/14 Tr., 9:9-11. Bretherick testified that she thereafter wrote a number of checks on both of the Accounts to various individuals and entities, as well as to herself. *See generally id.* at 11–49; Checks, Pls.' Ex. 13.

Based on Bretherick's testimony and the exhibits admitted during the hearing, the Court concludes that the proceeds from the sale of the 596 Property were distributed to the following individuals and entities:

| Individual/Entity | Amount |
|---|---|
| Becker Realty | $28,000 |
| Lawrence Omansky | $37,000 |
| Advantage Title Company | $176,937.63 |
| Brook Enterprises, Ltd. | Approximately $10,000 to $12,000[22] |
| Alison Bretherick | Approximately $47,727[23] |
| Driscoll & Redlich | $40,000[24] |
| Fischetti and Malgieri | $50,800 |
| Goetz Fitzpatrick | $40,000 |
| Law Office of Eric Franz | $205,000 |
| Karp Auto | $740.94 |
| Herrick Feinstein | $55,000 |
| Yolanda Hoey | $2,000 |
| T&M Protection Services | $18,000 |
| Marie Hoey | $5,000 |
| Brian Kupchik | $5,000 |
| Ellen Bruno | $1,018.50 |
| TOTAL AMOUNT: | Approximately $722,224.07 to $724,224.07 |

"[**Editor's Note:** The preceding image

contains the references for footnotes [22], [23,24] ]."

The Court notes that the above total exceeds the $700,075 in proceeds which were initially distributed at the April 1, 2014 closing. This is not surprising considering Bretherick's testimony that she made other "limited" deposits into the Accounts in addition to the Sale Proceeds. *See* Bretherick Test., 7/17/14 Tr., at 10:16-11:4, 22:7-17. It therefore appears that trust assets (*i.e.*, the Sale Proceeds) and non-trust assets may have been commingled in the Accounts. Since Bretherick opened the Accounts for the express purpose of depositing the Sale Proceeds, the Court finds that the Non-Debtor Defendants bear the burden of proving that any monies deposited into in the Accounts were not traceable to the sale of produce and should not be treated as trust assets. *See Atl. Tropical*, 2009 WL 436050, at *7 (holding that the creditor which received monies from the PACA debtor had the "burden to prove that the assets and monies it received were not traceable to produce"); *see also A&J Produce Corp. v. Watermelon Exp., LLC*, No. 08–CV–1850, 2010 WL 5395067, at *4 (D.Conn. Dec. 23, 2010) ("While commingling of trust assets is contemplated, the burden of tracing the origin of any disputed assets is on the PACA debtor.") (citing *In re Kornblum*, 81 F.3d at 287); *cf. Six L's Packing Co. v. W. Des Moines State Bank*, 967 F.2d 256, 258 (8th Cir.1992) ("[I]n a dispute over a payment from a checking account containing both trust funds and non-trust funds, the burden is on the PACA debtor … to show that the disputed payment is from a non-trust source."). The Non-Debtor Defendants did not attempt to make such a showing here. The Court therefore concludes that all funds which were (1) distributed at the April 1, 2014 closing and (2) distributed from and remain in the Accounts, are proceeds from the sale of the 596 Property.

### 3. Other Relevant Issues

Finally, Judge Spatt referred this matter for this Court to resolve "any other issues which may be relevant" to the question whether the 596 Property is a PACA asset and the location of the Sale Proceeds. Apr. 7, 2014 Order. It has been established that, because the Non-Debtor Defendants did not prove that the 596 Property is free from the PACA trust, Plaintiffs are entitled to "reach the proceeds" from the sale of that property. *In re Kornblum*, 81 F.3d at 287. However, as set forth in the previous section of this Report and Recommendation, the Sale Proceeds have been distributed to various individuals and entities other than LIB and Suffolk Banana. Plaintiffs assert that the individuals and entities who received Sale Proceeds must be required to disgorge them. *See* Pls.' PFF&CL ¶¶ 38-45.

"[A] third party who receives PACA trust property is not liable to the

**22.** The Court concludes that Brook is in possession of at least approximately $10,000 to $12,000 in proceeds which Bretherick testified remain in the Brook Account. *See* Bretherick Test., 7/17/14 Tr., at 20:16-19, 25:18-21.

**23.** This amount embodies $37,727 in checks written on the Accounts to Bretherick as well as approximately $10,000 which Bretherick testified still remains in the Bretherick Account. *See* Bretherick Test., 7/17/14 Tr., at 20:20-23. The Court notes that, although Bretherick testified that she did not cash check number 1001 for $5,000, *see id.* at 35:6-15, the Court declines to credit this testimony since it is not supported by the documentary evidence admitted at the hearing.

**24.** The Court declines to credit Bretherick's testimony that the $40,000 cashier's check issued to Driscoll & Redlich from the Brook Account was never cashed, since that testimony is not supported by the documentary evidence admitted at the hearing. *See* Bretherick Test., 7/17/14 Tr., at 13:15-20; 23:10-20.

trust beneficiaries, unless the PACA's trustee's act in giving the property was a breach of trust, and unless the third party had notice of the breach." *E. Potato Dealers*, 2011 WL 2669632, at *12; *see Am. Banana*, 362 F.3d at 41. Moreover, a third-party bona fide purchaser who (1) gave value for the trust property and (2) had no actual or constructive notice of the breach of trust is not liable to PACA trust beneficiaries." *E. Potato Dealers*, 2011 WL 2669632, at *13 (quoting *Albee Tomato*, 155 F.3d at 615). Based on the record presented, the Court finds that LIB breached the PACA trust by permitting Brook to use proceeds from the sale of produce to pay the purchase-money mortgage on the 596 Property. *See, e.g., id.* at *12 ("A PACA trustee may breach the trust in various ways, such as 'dissipation,' which includes 'any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions.'") (quoting *E. Armata*, 367 F.3d at 129). The question is whether the third-party transferees who received Sale Proceeds had notice of LIB's breach or can be deemed bona fide purchasers of the proceeds they received. *See E. Potato Dealers*, 2011 WL 2669632, at *12–13. If the transferees cannot establish either of these defenses, the Court may compel them to disgorge the Sale Proceeds. *See Nickey Gregory*, 597 F.3d at 595–96 (citing *Endico Potatoes*, 67 F.3d at 1067–68; Restatement (Second) of Trusts § 284).

 As noted above, the Court finds that both Brook and Yolanda Hoey received proceeds from the sale of the 596 Property. These proceeds must be disgorged unless the Non-Debtor Defendants can prove that Brook and/or Yolanda Hoey (1) had no notice of LIB's diversion of trust assets, or (2) that they were bona fide purchasers of the Sale Proceeds they

received. *See, e. g., Albee Tomato*, 155 F.3d at 615 ("In establishing the protected status of bona fide purchaser, the burden of proof is on the transferee."); *E. Potato Dealers*, 2011 WL 2669632, at *13 (noting that the third party must "raise a defense" of no notice of the breach or bona fide purchaser status). The Non-Debtor Defendants presented no evidence showing that either of these conditions have been met with respect to Brook or Yolanda Hoey. Moreover, the evidence presented at the hearing—specifically, John Balducci's testimony that (1) he was principal of both LIB and Brook during the time the mortgage was being paid, (2) he is "aware" of PACA trust requirements, and (3) the mortgage on the 596 Property was paid using funds from LIB's sale of produce—indicates that Brook had actual notice of the breach of trust. The Court therefore respectfully recommends to Judge Spatt that: (1) Brook be compelled to disgorge the approximately $10,000 to $12,000 in Sale Proceeds which Bretherick testified remain in the Brook Account (*i.e.*, Hudson Valley Bank Account No. 2000728001), and (2) Yolanda Hoey be compelled to disgorge the $2,000 in Sale Proceeds distributed to her via check numbers 0096 and 109 issued from the Bretherick Account (*i.e.*, Hudson Valley Bank Account No. 2000058806), and (3) these disgorged funds be placed in the PACA Escrow and distributed pursuant to the Stipulation "so ordered" by Judge Spatt, *see* DE 146.

With respect to the third parties who received Sale Proceeds—specifically, Becker Realty, Attorney Omansky, Advantage Title Company, Alison Bretherick, Driscoll & Redlich, Fischetti and Malgieri, Goetz Fitzpatrick, Law Office of Eric Franz, Karp Auto, Herrick Feinstein, T&M Protection Services, Marie Hoey, Brian Kupchik, and Ellen Bruno—Plaintiffs contend that they, too, must be compelled to disgorge the proceeds in their

possession. *See* Pls.' PFF&CL ¶ 45. Based on the existing record, however, the Court cannot determine whether these third parties should be held liable for their receipt of the proceeds. To avoid disgorgement, a third-party transferee must prove either that there was no notice of the PACA trustee's breach of the trust, or that the transferee is a bona fide purchaser of the PACA funds. *See, e.g., E. Potato Dealers,* 2011 WL 2669632, at *13. Other than Brook and Yolanda Hoey, none of the above-mentioned third parties have had an opportunity to present these defenses to the Court.[25] And while Plaintiffs posit reasons why certain third parties should not be considered bona fide purchasers of the Sale Proceeds, *see* Pls.' PFF&CL ¶¶ 42-43, the Court cannot simply accept these arguments without giving the third-party transferees an opportunity to be heard on this issue. Accordingly, the Court declines to recommend at this time that third parties Becker Realty, Lawrence Omansky, Advantage Title Company, Alison Bretherick, Driscoll & Redlich, Fischetti and Malgieri, Goetz Fitzpatrick, Law Office of Eric Franz, Karp Auto, Herrick Feinstein, T&M Protection Services, Marie Hoey, Brian Kupchik, and Ellen Bruno be compelled to disgorge the proceeds they received from the sale of the 596 Property.

The Court is mindful that the potential liability of the third-party transferees and their status as bona fide purchasers of the Sale Proceeds was not the focus of the evidentiary hearing before this Court. Indeed, the location of the Sale Proceeds did not even come to light until the second day of the hearing. Thus, to the extent that Plaintiffs wish to compel the above-mentioned third-party transferees to disgorge Sale Proceeds distributed to them, the Court recommends to Judge Spatt that Plaintiffs be permitted to make a motion seeking such relief.

## V. CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court finds that (1) the 596 Property is a PACA asset subject to the Consent Injunction, and (2) the proceeds from the sale of the 596 Property have been distributed to defendants Brook and Yolanda Hoey, as well as the third-party entities and individuals set forth in Section IV.B.2 of this Report and Recommendation. The Court further recommends to Judge Spatt that: (1) Brook be compelled to disgorge to the approximately $10,000 to $12,000 in Sale Proceeds which Alison Bretherick testified remain in Hudson Valley Bank Account No. 2000728001; (2) Yolanda Hoey be compelled to disgorge the $2,000 in Sale Proceeds distributed to her via check numbers 0096 and 109 issued from Hudson Valley Bank Account No. 2000058806, and (3) that these disgorged funds be placed in the PACA Escrow and distributed pursuant to the parties' "so ordered" Stipulation. Finally, the Court recommends that to the extent Plaintiffs wish to compel the third-party transferees identified in this Report and Recommendation to disgorge the Sale Proceeds they received, Plaintiffs be permitted to make a motion on notice seeking such relief.

## VI. OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Pro-

---

**25.** The Court notes that Bretherick's testimony indicates that she exercised nearly exclusive control over the Accounts in addition to holding "power of attorney" with regard to Brook. Bretherick Test., 7/17/14 Tr., at 26:5-

20. However, Bretherick is not a party to this action and her testimony does not provide a sufficient basis for the Court to determine whether she should be held liable to Plaintiffs for her receipt of Sale Proceeds.

cedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Arthur D. Spatt, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Spatt prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Beverly v. Walker,* 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied,* 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

**SO ORDERED.**

Dated: Central Islip, New York

July 7, 2016